THE HICKS CO., INC.[1] (FORMERLY THE LYNN CORPORATION), (FORMERLY S. D. HICKS & SON COMPANY), PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3332–69—3334–69.   Filed August 9, 1971.

*John M. Doukas* and *John M. Barnes, Jr.*, for the petitioners.
*Joel Gerber*, for the respondent.

DAWSON, *Judge:* In these consolidated cases respondent determined Federal income tax deficiencies and additions to tax against the petitioners as follows:

---

[1] Consolidated herewith are the cases of Thomas Wheeler and Shirley C. Wheeler, docket No. 3333–69, and Thomas Wheeler, docket No. 3334–69.

| Petitioners | Taxable year ended | Deficiency | Addition to tax, sec. 6653(b), I.R.C. 1954 [2] |
|---|---|---|---|
| The Hicks Co., Inc. | July 31, 1957 | $14,174.52 | $7,087.26 |
| | July 31, 1958 | 23,495.25 | 11,747.63 |
| | July 31, 1959 | 33,056.42 | 16,528.21 |
| Thomas and Shirley C. Wheeler | Dec. 31, 1957 | 18,050.14 | 9,724.64 |
| | Dec. 31, 1958 | 2,264.29 | 1,132.14 |
| | Dec. 31, 1959 | 1,417.80 | 3,681.80 |
| Thomas Wheeler | Dec. 31, 1956 | 3,351.46 | 1,675.73 |

By an amendment to his answer in the Hicks Co., docket No. 3332–69, respondent alleged an increased deficiency of $4,160 for the taxable year ended July 31, 1959, and an increase in the addition to tax under section 6653(b) of $2,080.

The trial of these cases was long, involved, and complex. Many issues were presented. The key question, however, is whether respondent has proved by clear and convincing evidence that any part of the underpayment of tax by the corporate petitioner and Thomas Wheeler was due to fraud with intent to evade tax. If fraud has not been proved by respondent, the statute of limitations operates to bar the assessment of any deficiencies and additions to tax against the petitioners for the years before us. An important, perhaps crucial, factor in respondent's tendered proof of fraud revolves around the admissibility of the testimony of Raymond L. White contained in the record of *United States* v. *Thomas Wheeler*, Criminal No. 63–163–F (D. Mass.), which was offered by respondent in these proceedings and objected to by petitioners. In addition, certain oral and written statements made by Raymond L. White to respondent's agents were objected to as hearsay.

If fraud has been proved by respondent, then the following issues must be decided:

1. Whether the corporate petitioner, through its officers, understated its taxable income by deducting salary expense which was not paid during the taxable years ended July 31, 1957, and July 31, 1958, or within 2½ months thereafter, in the amounts of $7,083 and $8,000, respectively.

2. Whether the corporate petitioner, through its officers, understated its taxable income for the taxable year ended July 31, 1957, by deducting, as salary expense, $3,500 represented by a check made payable to Raymond L. White, which was paid to its president, Thomas Wheeler, for his personal use.

3. Whether the corporate petitioner, through its officers, understated its taxable income for the taxable years ended July 31, 1957, July 31, 1958, and July 31, 1959, by deducting claimed travel expenses for its

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended ,unless otherwise indicated

president and Raymond L. White and paying its president these amounts for his personal use, in the total amounts of $7,317.88, $3,619, and $20,299.50, respectively.

4. Whether the corporate petitioner, through its officers, understated its taxable income for the taxable years ended July 31, 1957, and July 31, 1958, by deducting as its professional expense moneys paid to attorneys who represented Thomas Wheeler and his estranged wife in their personal divorce proceeding in the amounts of $5,000 and $2,500, respectively.

5. Whether the corporate petitioner, for its taxable year ended July 31, 1957, improperly deducted the costs of acquiring real estate, in the amount of $685.88, as professional service expense.

6. Whether, for its taxable year ended July 31, 1958, the corporate petitioner failed to report $33,143.87 attributable to gains realized from insurance reimbursements in excess of damage to property basis caused by two fires.

7. Whether, for its taxable year ended July 31, 1958, the corporate petitioner failed to report income from the sale of boilers in the amount of $1,500.

8. Whether, for its taxable year ended July 31, 1958, the corporate petitioner failed to report income from the sale of an Ingersoll Rand compressor in the amount of $278.13.

9. Whether, for its taxable year ended July 31, 1958, the corporate petitioner failed to include in income a refund of Massachusetts excise tax in the amount of $2,490.87.

10. Whether, for its taxable year ended July 31, 1959, the corporate petitioner failed to report gain from the sale of real estate located in East Boston, Mass., in the amount of $61,719.17.

11. Whether the corporate petitioner, for its taxable year ended July 31, 1959, understated its taxable income by taking a $6,918.62 bad debt deduction with respect to a "shell" corporation which still held some of petitioner's valuable real estate at the close of that fiscal year.

12. Whether the corporate petitioner has shown that it is entitled to deductions for State and local taxes in excess of the following amounts for the taxable years ended July 31, 1957, and July 31, 1958:

| | Taxable year ended July 31— | |
| Type of tax | 1957 | 1958 |
| Massachusetts excise tax | $3,050.60 | $550.02 |
| Asheville real estate tax | 517.47 | 29.06 |
| Boston real estate tax | | 16,702.80 |

13. Whether Thomas Wheeler understated his taxable income for the year 1957 by claiming $4,500 for legal fees incident to his personal divorce action.

14. Whether Thomas Wheeler understated his taxable income by failing to report alleged travel reimbursements from corporate petitioner which were converted to his personal use during the years 1957 and 1958 in the amounts of $8,047.88 and $1,979.50, respectively.

15. Whether Thomas Wheeler understated his 1957 taxable income by failing to report $3,500 which he caused the corporate petitioner to make payable by check to Raymond L. White, and then caused the proceeds of the check to be converted to his own personal use and charged to the office salary account of the corporate petitioner.

16. Whether Thomas Wheeler failed to include $7,500 in his 1957 taxable income, being an aggregate amount paid on his behalf by the corporate petitioner for attorneys fees for his personal divorce action.

17. Whether Thomas Wheeler understated his taxable income by failing to report alleged travel reimbursements from the Hicks Corp. which were based on travel vouchers, and the "reimbursements" were converted to his personal use during the taxable years 1956, 1957, 1958, and 1959, in the amounts of $6,005.60, $17,274.75, $3,857.69, and $2,180.92, respectively.

18. Whether Thomas and Shirley Wheeler failed to report interest income, received from their 1957 Federal income tax refund, in the amount of $246.68 on their 1958 income tax return.

19. Whether Thomas and Shirley Wheeler are entitled to a medical deduction in excess of $104.90 for their taxable year 1957.

20. Whether Thomas Wheeler failed to report $9,300 in income received from Wheeler Rocket Corp. during his taxable year 1959.

21. Whether Thomas Wheeler failed to report $494.84 in income received from Border Industries, Inc., during his taxable year 1956.

## FINDINGS OF FACT

Some of the facts are stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

The Hicks Co. (formerly the Lynn Corp.) (formerly S. D. Hicks & Son Co.), hereinafter referred to as Lynn, was organized and existing under the laws of Massachusetts with its principal office being located at 1623 Hyde Park Avenue, Boston, Mass., on July 3, 1969, the date of filing its petition herein.

Lynn filed its Federal corporate income tax returns (Form 1120) for the taxable years ended July 31, 1957, July 31, 1958, and July 31, 1959, with the district director of internal revenue at Boston, Mass.

Thomas Wheeler and his wife, Shirley C. Wheeler, resided in Miami Beach, Fla., on July 3, 1969, the date of filing their petition herein.

Thomas Wheeler and his deceased wife, Ruby P. Wheeler, filed their joint Federal income tax return for the taxable year 1956 with the district director of internal revenue at Boston, Mass.

Thomas Wheeler and his wife, Shirley C. Wheeler, filed their joint Federal income tax returns for the taxable years 1957, 1958, and 1959 with the district director of internal revenue at Boston, Mass. On November 1, 1962, Thomas Wheeler and his wife, Shirley C. Wheeler, filed an amended joint Federal income tax return for the taxable year 1959.

Lynn was originally incorporated during 1942, under the name of S. D. Hicks Engineering Co., Inc.; its name was changed to S. D. Hicks & Son Company during 1946; and on July 22, 1958, articles of amendment were filed changing its name to The Lynn Corporation.

Lynn's records were kept and its Federal income tax returns for the fiscal years ended July 31, 1957, July 31, 1958, and July 31, 1959, were reported under the accrual method of accounting.

Thomas Wheeler reported his income for the taxable years 1956, 1957, 1958, and 1959 on the cash basis method of accounting.

During the taxable years ended July 31, 1957, July 31, 1958, and July 31, 1959, Thomas Wheeler and Raymond L. White were both directors of Lynn. Thomas Wheeler was the president and treasurer of Lynn. Raymond L. White was the assistant treasurer of Lynn.

During the years in question, substantially all of Lynn's receipts, as reported on its tax returns, were derived from rentals, as follows:

| Fiscal year ended July 31— | Total receipts | Rental receipts | Percent of rental receipts to total receipts |
|---|---|---|---|
| 1957 | $126,750.34 | $115,133.00 | 90 |
| 1958 | 111,294.00 | 110,722.00 | 99 |
| 1959 | 121,238.69 | 101,238.69 | 84 |

During the taxable years ended July 31, 1957, July 31, 1958, and July 31, 1959, Lynn's assets consisted mainly of real estate and a stock interest in the Hicks Corp. A substantial portion of the real estate held was leased to the Hicks Corp.

On May 1, 1957, the balance of Lynn's investment account was $526,614.40 made up of the following items:

| | |
|---|---|
| Hicks Corp | $505,145.00 |
| Agassiz Development Corp | 13,200.00 |
| Land in Pawtucket, R.I | 8,269.40 |
| Total | 526,614.40 |

The business activity of Lynn during the taxable years in issue was the holding of the real estate and 100 percent of the stock in the Hicks Corp.

Raymond L. White was also the assistant treasurer of the Hicks Corp. during the fiscal years ended July 31, 1957, 1958, and 1959. He was a certified public accountant and a lawyer.

The Hicks Corp. was the "operating company" during the years in question, and Lynn was the "holding company." The Hicks Corp.'s only business activity was the fulfillment of U.S. Government defense contracts concerning guided missiles.

The books and records of the Hicks Corp. were closely scrutinized by U.S. Government auditors, but the books and records of Lynn were not audited by U.S. Government auditors, and it did not operate pursuant to Government contracts.

Thomas Wheeler had a college education and attended law school.

Raymond L. White had charge of Lynn's accounting, office personnel, and general office work during 1956, 1957, 1958, and 1959. He had the power to and did sign personal checks for Thomas Wheeler. He also had the power to and did visit Thomas Wheeler's safe-deposit box during the years in question.

Thomas Wheeler had known Raymond L. White for 30 years. White was a personal friend and confidant of Wheeler during the years 1956, 1957, 1958, and 1959.

Donald Dougherty was a special agent for the Internal Revenue Service in Newark, N.J., during 1959. During June of 1959 an anonymous informant came to Special Agent Dougherty and engaged in conversation concerning the petitioners here involved. Raymond L. White was not the anonymous informant that visited Special Agent Dougherty during 1959. The record does not reveal the existence of an informant other than the "anonymous" one who spoke with Special Agent Dougherty during June 1959.

David J. Sliney is employed by the Internal Revenue Service where, among other duties, he is the custodian of the only informant claim file in Massachusetts. No matter where an informant's claim for reward is filed, it can only be processed in the district or State in which the taxpayer files his tax return or where the examination takes place. Informants' claims are filed by the name of the informant and the name of the taxpayer about whom the information was submitted. No informants' claims for reward were filed with respect to Thomas Wheeler, Ruby Wheeler, Shirley Wheeler, the Hicks Corp., the Lynn Corp., S. D. Hicks & Son Co., or the Hicks Co., Inc. Raymond L. White did not file an informant's claim for reward.

The investigation of the petitioners herein was assigned to Special Agent Arthur Ansbigian on September 24, 1959, and he commenced the investigation on October 9, 1959. He supervised the investigation and was involved with the case until the date of trial. He stated that Raymond L. White was not an informant.

Raymond L. White testified on behalf of respondent at a criminal trial concerning the petitioners here involved on April 29, 30, and

May 1, 1964, in the case of *United States of America* v. *Thomas Wheeler*, Criminal No. 63–163–F (D. Mass.).

Subsequent to testifying during April and May 1964 and at the time of the trial of the instant cases, Raymond L. White was mentally incompetent to testify.

Except for questions concerning whether Raymond L. White was an informant, Thomas Wheeler, through his attorney, John M. Doukas, was allowed full and complete cross-examination of Raymond White when he testified in the U.S. District Court, Criminal Case No. 63–163–F.

Arthur Ansbigian was employed for 22 years as a special agent with the Internal Revenue Service, and his duties were to conduct income tax investigations in situations where fraud is indicated or alleged. Prior to being employed by the Internal Revenue Service, he was in public accounting and employed in private industry performing accounting work. He studied accounting at Boston University where he received a bachelor of science degree in business administration. He has been licensed as a certified public accountant in Massachusetts since April 1955.

Special Agent Ansbigian first visited the Hicks Corp. on October 9, 1959, and Lynn on October 29, 1959.

The first time Special Agent Ansbigian met Raymond L. White was on October 9, 1959, when the Hicks Corp. was first visited. On such visit to the Hicks Corp. Mr. White was asked to produce the books and records.

On October 29, 1959, Special Agent Ansbigian made his first request of Raymond L. White for records of Lynn and Mr. White replied that he would see what he could do about getting them. Ansbigian first received the books and records of Lynn on November 12, 1959, and examined them on numerous occasions thereafter.

Raymond L. White continued to supply Lynn's books and records to Special Agent Ansbigian until March 2, 1960, at which time an attorney and certified public accountant were engaged to represent the petitioners.

A "reopening letter" was given to representative, Harry Eigner, with respect to taxable year 1957, which had previously been examined.

Lynn, during its taxable years ended July 31, 1957, 1958, and 1959, maintained a double-entry system of books. The records made available to Ansbigian were a general ledger, general journals, cash receipts and disbursements, purchases and sales, bank statements, canceled checks, and about 12 job order cost sheets concerning years prior to the investigation.

Raymond L. White worked for Thomas Wheeler's corporations from 1947 through 1961. Thomas Wheeler set the policies of Lynn, directed its activities, and made the necessary management decisions.

*Lynn—FYE July 31, 1957, Travel Expense—$7,317.88*

Thomas Wheeler generally submitted his Hicks and Lynn "Expense Account" sheets to Raymond L. White without a detailed or explanatory substantiation, although the face of the sheet recited "as per attached list." Employees, other than Thomas Wheeler, would attach substantiating documentation to their "Expense Account" sheets.

Early in the investigation, Raymond L. White supplied Lynn records and supporting documents directly to respondent's agents.

At one point in the investigation, Thomas Wheeler told Raymond L. White to first submit the supporting documents to Thomas Wheeler's secretary who was to make them available to respondent's agents. Raymond L. White would supply single-sheet "Expense Accounts" to Thomas Wheeler's secretary. Respondent's agents would receive the single-sheet "Expense Accounts" with a supporting detailed attachment. When respondent's agents returned the "Expense Accounts" to Raymond L. White, the supporting detailed attachments, which were not attached when Raymond L. White took them from Lynn's files and gave them to Thomas Wheeler's secretary, were attached.

Thomas Wheeler and his secretary altered and/or amended original records subsequent to the commencement of the investigation of Lynn's and Thomas Wheeler's taxable years 1956 through 1959.

During the course of the investigation, Special Agent Ansbigian inquired of Raymond L. White about a $2,217.88 and $3,500 travel item, and a February 16, 1960, meeting was scheduled, at which time Raymond L. White was to produce his bankbook. At the February 16, 1960, meeting at Lynn with Special Agent Ansbigian, Raymond L. White stated that Thomas Wheeler told him he needed $2,200 and to make up an "Expense Sheet" for Raymond L. White, draw a check, cash it, and remit the money to Thomas Wheeler and charge the travel expense to Lynn.

During September 1957, Raymond L. White, at the direction and request of Thomas Wheeler, drafted a fictitious "Expense Account" in the total amount of $2,217.88 for the period ended July 31, 1957. The July 31, 1957, "Expense Account" was composed of alleged travel by Raymond L. White to various cities and 15,300 miles of local travel which Raymond L. White admitted were picked "out of the air" and that he had not traveled as listed on the "Expense Account" sheet.

At Thomas Wheeler's direction, Raymond L. White drafted a check dated September 30, 1957, in the amount of $2,217.88, cashed the check, and turned the entire amount over to Thomas Wheeler.

At Thomas Wheeler's direction, Raymond L. White charged the $2,217.88 to travel expenses by posting the transaction through the cash payments journal and then into the travel expense account in the general ledger of Lynn for the period ended July 31, 1957.

The $2,217.88 fictitious travel expense was included in the $8,047.59 total travel expense deduction reflected on Lynn's income tax return for its fiscal year ended July 31, 1957.

Thomas Wheeler did not report the $2,217.88 on his 1957 income tax return.

An "Expense Account" and "Inter Department Memorandum" were submitted to Special Agent Ansbigian in support of a $1,300 deduction for travel expense on the books of Lynn during its fiscal year ended July 31, 1957.

During the instant income tax investigation, Raymond L. White submitted Exhibit 19–S to Thomas Wheeler and/or his secretary, and it did not include the second sheet entitled "Inter Department Memorandum." When Exhibit 19–S was returned to Raymond L. White during the investigation, the "Inter Department Memorandum" was attached with Thomas Wheeler's handwriting as follows: "This is nuts whoever made this out."

Check No. 23432 was drafted by Raymond L. White to the order of "Cash" on April 5, 1957, and on April 8, 1957, Raymond L. White cashed the check in the amount of $1,300, and gave the currency to Thomas Wheeler. Raymond L. White posted the $1,300 through the cash payments journal of Lynn to the travel account, and said amount was a part of the $8,047.59 travel deduction on Lynn's income tax return for the fiscal year ended July 31, 1957. The dates on the "Expense Account" and "Inter Department Memorandum" were altered from "1955" to "1957."

The title of the "Expense Account" (Exhibit 19–S) was altered from "S. D. Hicks & Son Co., Inc." to "Lynn Corporation" by Thomas Wheeler. The S. D. Hicks & Son Company's name was not changed to The Lynn Corporation until July 22, 1958. Thomas Wheeler altered Exhibit 19–S during the instant income tax investigation and not during Lynn's taxable year ended July 31, 1957.

Special Agent Ansbigian was supplied with airline statements and receipts during the investigation which did not reflect that Thomas Wheeler traveled to Chicago, Los Angeles, or San Francisco during April 1957.

An "Expense Account" and "Inter Department Memorandum" were submitted to Special Agent Ansbigian in support of a $3,800 deduc-

tion for travel expense on the books of Lynn during its fiscal year ended July 31, 1957.

Raymond L. White submitted Exhibit 21-U to Thomas Wheeler and/or his secretary and it did not include the second sheet entitled "Inter Department Memorandum." When Exhibit 21-U was returned to Raymond L. White during the investigation, the "Inter Department Memorandum" was attached.

Check No. 27 was drafted by Raymond L. White to the order of Thomas Wheeler on August 30, 1957, in the amount of $3,800, for payment on the "Expense Account" dated July 31, 1957. Thomas Wheeler endorsed check No. 27 to Raymond L. White who cashed the check and remitted the entire $3,800 proceeds to Thomas Wheeler. The $3,800 payment for travel expense covers the 6-month period ended July 31, 1957, which includes April 1957, the date of the "Expense Account" in the amount of $1,300. Check No. 27, in the amount of $3,800, was issued subsequent to the close of Lynn's fiscal year ended July 31, 1957, and no amount was accrued or "set-up" on Lynn's books to cover the $3,800.

The $3,800 check was recorded in the cash disbursement journal under the date of July 26, 1957, and charged to the travel expense account of Lynn's fiscal year ended July 31, 1957. The $3,800 constituted part of the $8,047.59 travel expense deduction claimed in Lynn's return for its fiscal year ended July 31, 1957.

The alleged travel destinations in Exhibit 21-U do not correspond to the alleged travel destinations in Exhibit 19-S, although they purport to be for the same period.

For the 6-month period ending July 31, 1957, Thomas Wheeler claimed travel expense for Lynn in the total amount of $5,100 and travel expenses for Hicks in the total amount of $12,705, which amounts were paid to him by the respective corporations. All expense accounts submitted by Thomas Wheeler during 1957, 1958, and 1959 were in round amounts.

The airline statements and ticket receipts show that Thomas Wheeler did not travel to most of the destinations shown in the $3,800 Lynn "Expense Account."

The May and June 1957 "Expense Account" submitted by Thomas Wheeler to Hicks accounts for travel expenses for every weekday except for one or two during the 2-month period which is also included in the alleged travel for Lynn.

Thomas Wheeler did not report any part of the $3,800 payment from Lynn on his 1957 income tax return.

The $2,217.88, $1,300, and $3,800 are the components of the $7,317.88 fictitious travel adjustment in the statutory notice to Lynn, dated April 8, 1969.

992

On December 28, 1956, Ruby P. Wheeler, former wife of Thomas Wheeler, filed a libel for divorce from matrimony, thereby initiating a suit in the Norfolk County Probate Court, numbered 16,122.

By a petition filed April 22, 1957, Ruby P. Wheeler sought to restrain Thomas Wheeler and others from disposing of or impairing the value of his shareholdings in Lynn or Hicks, pursuant to which an injunction was issued under prayer No. 1 of Ruby P. Wheeler's petition, which provided as follows:

That a temporary restraining order issue enjoining the respondents Thomas Wheeler, Raymond L. White, John C. Reimers, Richard F. Hingstron, S. D. Hicks & Son Company, and The Hicks Corporation, until further order of this court from concealing, transferring, encumbering, disposing of or otherwise placing beyond the reach of process of this court any and all stock in said corporations which stands in the name of the respondent Thomas Wheeler or is owned by him or in which he has any interest, legal or equitable, and any and all proceeds of any such stock standing in his name, owned by him or in which he has any legal or equitable interest.

By trust agreement date May 16, 1957, Thomas Wheeler and Ruby P. Wheeler resolved the property and alimony disputes by agreeing to a $1,666.67 monthly payment by Thomas Wheeler, secured by a pledge of 25 percent of his stock interest in Lynn.

Talcott M. Banks represented Ruby P. Wheeler in the divorce proceeding.

Lynn and Hicks were involved in the divorce proceeding only to the extent that they were restrained from depleting the value of Thomas Wheeler's stock interests in the corporations.

On August 21, 1957, Samuel H. Cohen filed an appearance as attorney for Thomas Wheeler, et al., in the divorce proceeding. Cohen's appearance in the divorce proceeding was subsequent in time to the execution and filing of the trust agreement.

Fifty-six days before Samuel H. Cohen filed an appearance in the divorce proceeding, a check in the amount of $2,000 was drafted and signed by Raymond L. White to the order of Sam Cohen in payment of his representation of Thomas Wheeler in the divorce.

The June 26, 1957, check, numbered 12, in the amount of $2,000 to Sam Cohen (Samuel H. Cohen), contained the following notation by Raymond L. White: "Charge to T. Wheeler account." Raymond L. White did not post to or charge Thomas Wheeler's accounts payable to Lynn as he had noted on the check.

At the request and direction of Thomas Wheeler, Raymond L. White charged the $2,000 June 26, 1957, payment to Samuel H. Cohen to the professional services account of Lynn.

The $2,000 payment to Samuel H. Cohen for representation in the divorce proceeding was a part of the $11,419.87 professional services deduction on Lynn's return for the fiscal year ended July 31, 1957.

The balance of Lynn's professional services account for the fiscal year ended July 31, 1957, was $14,931.64, which was shown on its return for that period as "Engineering Services $3,511.77" and "Professional Services $11,419.87."

Joseph L. Dupont represented Thomas Wheeler in divorce proceeding No. 16,122 from April 24, 1957, through September 4, 1957. He received one check in the amount of $3,000 as payment for his representation of Thomas Wheeler in the divorce proceeding. The only "representation" provided by Joseph L. Dupont for parties to the divorce proceeding, other than Thomas Wheeler, was to file answers for them.

Raymond L. White, at the request and direction of Thomas Wheeler, charged the $3,000 payment to Joseph L. Dupont to the professional services account of Lynn for the fiscal year ended July 31, 1957.

Raymond L. White noted in the cash payments journal that the $3,000 payment to Joseph L. Dupont was an advance to Thomas Wheeler but, at Thomas Wheeler's request and direction, the $3,000 was charged to the professional services account of Lynn. Joseph L. Dupont did not send a bill to Lynn for his legal services.

The $3,000 payment to Joseph L. Dupont for representation of Thomas Wheeler in a divorce proceeding was charged against the income of Lynn, being reflected in professional service expense on its return for the taxable year ended July 31, 1957, in the total amount of $11,419.87.

Petitioners have failed to submit any evidence to contradict the disallowance and capitalization of $685.88 in professional services for Lynn's taxable year ended July 31, 1957.

The $2,000 check to Samuel H. Cohen, $3,000 check to Joseph L. Dupont, and $685.88 capitalization of professional services constitute the total of $5,685.88 to Lynn's professional services deduction for its taxable year ended July 31, 1957.

*Lynn—FYE July 31, 1957, Compensation of Officers—$10,583*

Each month a general journal entry of either $416 or $417 was recorded in Lynn's books accruing "office salaries" during the fiscal year ended July 31, 1957. At the close of the fiscal year of Lynn ended July 31, 1957, $5,000 of "office salaries" was accrued to bring the total accrual for that period to $10,000. The $10,000 of "office salaries" accruals for Lynn's fiscal year ended July 31, 1957, was correspondingly charged to the office salaries account. The books and records of

Lynn reflect that the entire accrual of $10,000 was not paid during Lynn's fiscal year ended July 31, 1957, or within 2½ months thereafter. Although the $10,000 salary accrual for Lynn's fiscal year ended July 31, 1957, was not paid, it was deducted in full on Lynn's return for that period as part of a $13,500 deduction entitled "Compensation of Officers" and described in Schedule E as Thomas Wheeler's compensation as president and treasurer of Lynn.

$2,917 was paid on September 30, 1956, and charged against the accrued salaries of Lynn, but was in payment of the balance of the accrued salary account of Lynn for the fiscal year ended July 31, 1956. Even though the $2,917 was in payment of prior years' salaries, respondent allowed this payment as a deduction on Lynn's fiscal year ended July 31, 1957, return.

On September 30, 1957, under Thomas Wheeler's instructions, Raymond L. White made out a check in the amount of $3,500 payable to the order of Raymond L. White. The $3,500 check was made out on the same day, September 30, 1957, as the $2,217.88 travel expense check, at the request and direction of Thomas Wheeler. Thomas Wheeler told Raymond L. White to make out a check for $3,500, show it on Lynn's books as a bonus or salary, cash the check along with the $2,217.88 check, give the cash to Thomas Wheeler, and report the $3,500 on Raymond L. White's personal Federal income tax return.

The $3,500 and $2,217.88 checks were cashed on the same day, October 1, 1957, at 2:07 p.m., by Raymond L. White, as indicated on the reverse of each check. At Thomas Wheeler's direction, Raymond L. White charged the $3,500 to the office salary account of Lynn for the fiscal year ended July 31, 1957, although the check was drawn September 30, 1957.

Raymond L. White, in a discussion with Thomas Wheeler, indicated that if he reported the $3,500 on his tax return, he would incur about $1,000 of income tax. Thomas Wheeler gave $1,000 of the $3,500 to Raymond L. White, and White deposited the $1,000, along with $100 of his own funds in his savings account with the Lexington Trust Co. on October 2, 1957. Raymond L. White did report the $3,500 on his 1957 Federal income tax return.

The $3,500 "salary" was not accrued on the books of Lynn for its fiscal year ended July 31, 1957.

During the initial inquiry about the $2,217.88 and $3,500 items by Special Agent Ansbigian, Raymond L. White attempted to cover up the actual transaction, but when confronted with facts presented by Special Agent Ansbigian, Raymond L. White told of the fictitious expense account and "kickback bonus or salary."

At the time of the $2,217.88 fictitious travel and $3,500 bonus or salary "kickbacks," Thomas Wheeler "was having trouble and he needed the money."

The $10,000 accrued and unpaid salary, and $3,500 kickback to Thomas Wheeler, less the $2,917 payment for a July 31, 1956, accrual, constitute the net $10,583 adjustment to Lynn's officers' salaries for the fiscal year ended July 31, 1957.

### Lynn—FYE July 31, 1958, Compensation of Officers—$8,000

During Lynn's fiscal year ended July 31, 1958, $10,000 of salary was accrued by means of 8 monthly accruals of $833.34 and 4 monthly accruals of $833.32. Correspondingly, $10,000 was charged against the officers salaries account for Lynn's fiscal year ended July 31, 1958. A $10,000 deduction was claimed against income for compensation of officers on Lynn's return for the taxable year ended July 31, 1958. During Lynn's fiscal year ended July 31, 1958, there was a $2,000 payment charged against accrued salaries. The net of $8,000 accrued during Lynn's fiscal year ended July 31, 1958, was not paid during that year or within 2½ months thereafter.

At the close of Lynn's fiscal year ended July 31, 1958, there remained an $18,000 accrual of salary composed of $10,000 accrued during the fiscal year ended July 31, 1957, and a net of $8,000 accrued during the fiscal year ended July 31, 1958.

On or about May 16, 1961, when Special Agent Ansbigian closed his examination, the balance of the accrued salary account remained at $18,000, reflecting that the accrued salary of Lynn for the fiscal years 1957 and 1958 had not yet been paid.

During Lynn's fiscal year ended July 31, 1959, $10,000 of salary was accrued as in prior fiscal years. The $10,000 accrual of salary during Lynn's fiscal year ended July 31, 1959, was "reversed" with the following explanation: "To cancel office salaries accrued each month from August 1, 1958, to July 31, 1959" and not reflected in Lynn's return for the taxable year ended July 31, 1959. Lynn's Federal income tax return for its fiscal year ended July 31, 1959, was not filed with the district director of internal revenue at Boston, Mass., until November 24, 1959, subsequent to Special Agent Ansbigian's commencement of the income tax investigation on October 9, 1959.

### Lynn—FYE July 31, 1958, Travel Expense—$3,619

During Lynn's fiscal year ended July 31, 1958, Thomas Wheeler submitted to Raymond L. White two "Expense Accounts" in the amounts of $709 and $500. Each of the "Expense Accounts," Exhibits

29–AC and 30–AD, were marked "Expense as per list," but no list was attached to either when originally submitted by Thomas Wheeler to Raymond L. White or when submitted to Special Agent Ansbigian during the investigation.

Pursuant to Thomas Wheeler's instructions, Raymond L. White accrued the $709 and $500 and charged them to travel expenses by means of a journal entry combining the amounts to total $1,209. The entry accruing $1,209 of travel expense is dated July 31, 1958, and bears the following explanation: "To bring into the books the travel expenses for March and April 1958 as per travel expense voucher and estimated further expenses to July 31, 1958." The $1,209 in accrued travel expense was not paid to Thomas Wheeler during the taxable year ended July 31, 1958, or within 2½ months thereafter.

The $1,209 was posted to the travel expenses general ledger account and included in the $4,087.58 total of travel expenses for Lynn's fiscal year ended July 31, 1958, which was claimed as a deduction from its income on the corporate return for the same period. When Special Agent Ansbigian concluded his examination of Lynn on or about May 16, 1961, the $1,209 had not been paid.

On October 4, 1957, Raymond L. White made out a Lynn check, numbered 43, in the amount of $730, to the order of Thomas Wheeler in payment of Thomas Wheeler's "Expense Account" submitted for August and September, 1957.

Attached to Thomas Wheeler's "Expense Account" for August and September 1957 is a list of alleged trips to various cities with charges for each in round amounts. Thomas Wheeler submitted "Expense Accounts" to Hicks for August and September 1957 with lists of his alleged activity for Hicks.

Thomas Wheeler was paid in full the amounts claimed on his Hicks August and September 1957 "Expense Accounts" by Hicks checks dated and numbered October 5, 1957—17437 and December 4, 1957—18633, respectively.

The Hicks "Expense Accounts" purport to account in detail for every weekday of August and September 1957, except for one weekday.

The alleged travel expense for August and September 1957, in the amount of $730, was part of the $4,087.58 balance in the Lynn travel expense account for its fiscal year ended July 31, 1958, which total amount was claimed as a deduction against Lynn's income on its return for the same period.

During January 1958, Thomas Wheeler submitted an "Expense Account" to Lynn for the months of October, November, and December 1957, for which he was paid $1,270 on January 14, 1958. Thomas Wheeler submitted "Expense Accounts" to Hicks for October, Novem-

ber, and December 1957 with attached lists of his alleged activity for Hicks.

Thomas Wheeler was paid in full the amounts claimed on his Hicks October, November, and December 1957 "Expense Accounts" by Hicks checks dated and numbered December 11, 1957—18787, January 14, 1958—19420, and January 24, 1958—19522, respectively. The Hicks "Expense Accounts" purport to account in detail for every weekday of October, November, and December 1957, showing Thomas Wheeler to be in travel status each weekday of the 3-month period. Some of the locations allegedly traveled to by Thomas Wheeler, as per the Lynn "Expense Account" for October, November, and December 1957, do not appear on the Hicks "Expense Accounts" for the same 3 months, although every weekday is accounted for.

The alleged travel expense for October, November, and December 1957, in the amount of $1,270, was part of the $4,087.58 balance in the Lynn travel expense account for its fiscal year ended July 31, 1958, which total amount was claimed as a deduction against Lynn's income on its return for the same period.

During March 1958, Thomas Wheeler submitted an "Expense Account" to Lynn for alleged travel during January and February 1958, in the amount of $410. By a check dated March 3, 1958, and numbered 106, Thomas Wheeler was reimbursed for his claimed January and February 1958 travel expenses.

Thomas Wheeler submitted "Expense Accounts" to Hicks for January and February 1958 with attached lists of his alleged activities for Hicks. Thomas Wheeler was paid in full the amounts claimed on his Hicks January and February 1958 "Expense Accounts" by Hicks checks dated and numbered February 7, 1958—19714 and March 4, 1958—20092, respectively.

The Hicks "Expense Accounts" purport to account in detail for every weekday of January and February 1958, showing Thomas Wheeler to be in travel status each weekday of the 2-month period. Some of the locations allegedly traveled to by Thomas Wheeler, as per the Lynn "Expense Account" for January and February 1958, do not appear on the Hicks "Expense Accounts" for the same 2-month period, although every weekday is accounted for.

The alleged travel expense for January and February 1958, in the amount of $410, was part of that $4,087.58 balance in the Lynn travel expense account for its fiscal year ended July 31, 1958, which total amount was claimed as a deduction against Lynn's income on its return for the same period.

The $1,209 unpaid travel expense accrual and $730, $1,270, and $410 fictitious "Expense Accounts" comprise the $3,619 travel expense adjustment for Lynn's taxable year ended July 31, 1958.

*Lynn—FYE July 31, 1958, Professional Services—$2,500*

On September 27, 1957, Raymond L. White drafted a Lynn check, numbered 35, in the amount of $2,500, to the order of Samuel Cohen, who received the check and endorsed it over to the order of Palmer, Dodge, Bradford and Gardner. Talcott Banks, a partner in the firm of Palmer, Dodge, Bradford and Gardner who represented Ruby P. Wheeler in her divorce from Thomas Wheeler, received Lynn's check numbered 35, in the amount of $2,500, as a fee for services in the divorce proceeding, on October 8, 1957.

The Probate Court had ordered Thomas Wheeler to pay the legal fees for Ruby's attorney in connection with the divorce proceeding.

When Talcott Banks received check numbered 35, in the amount of $2,500, from Lynn rather than Thomas Wheeler, he wrote to Thomas Wheeler or his counsel calling attention to the fact that "corporate funds [were] being used for a personal obligation," but that he assumed the money represented an advance from Lynn to Thomas Wheeler. Talcott Banks was not notified that the funds represented by check numbered 35 were not those of Thomas Wheeler. Talcott Banks did not represent Thomas Wheeler.

Thomas Wheeler paid Talcott Banks at least $6,600 between May 6, 1956, and November 13, 1958, by means of personal checks.

When Raymond L. White recorded check numbered 35, in the amount of $2,500, in Lynn's cash payment journal, he did not list an account number but placed Thomas Wheeler's initials (TW) in the account number column.

The entry in Lynn's cash payment journal for check numbered 35, in the amount of $2,500, was posted to the professional services account (No. 914) by Raymond L. White, as determined by Thomas Wheeler.

The $2,500 paid to Talcott Banks for representing Ruby P. Wheeler in the divorce proceeding was part of the $6,107.67 balance of Lynn's professional services account which was deducted from Lynn's income for its taxable year ended July 31, 1958.

*Lynn—FYE July 31, 1959, Travel Expenses—$20,299.50*

On July 1, 1959, Raymond L. White drafted a Lynn check numbered 457, in the amount of $8,000, to the order of Thomas Wheeler.

On July 1, 1959, Thomas Wheeler deposited Lynn check numbered 457 in his personal checking account with the First National Bank of Boston.

Raymond L. White did not see a "voucher" (expense account) or any explanation with respect to Lynn check numbered 457 in the amount of $8,000.

Special Agent Ansbigian was not shown an "Expense Account" with respect to the $8,000 payment to Thomas Wheeler by Lynn check numbered 457.

Raymond L. White listed the $8,000 payment in Lynn's cash payment journal for July 1959, as chargeable to "travel expense," account numbered 919. Raymond L. White posted the $8,000 payment to Lynn's travel expense account, based on the request and direction of Thomas Wheeler.

The $8,000 payment by check numbered 457 to Thomas Wheeler was part of the $20,852.29 balance of the travel expense account which was deducted against Lynn's income on its return for the taxable year ended July 31, 1959.

Thomas Wheeler and Shirley C. Wheeler signed their original 1959 joint Federal income tax return on June 14, 1960, and it was received by the district director at Boston, Mass., on June 15, 1960, subsequent in time to Special Agent Ansbigian's commencing his investigation.

On December 3, 1959, Special Agent Ansbigian mentioned, in the presence of Thomas Wheeler, that claimed travel expense was a significant item in the investigation.

At the December 3, 1959, conference, Special Agent Ansbigian advised Thomas Wheeler that substantiation of travel vouchers would be needed, and Thomas Wheeler replied: "I am a very busy man and I don't intend to become a bookkeeper for the Government."

At a conference on March 2, 1960, Special Agent Ansbigian again advised, in Thomas Wheeler's presence, that travel expense was a significant item in the investigation. At that conference, Ansbigian advised Thomas Wheeler and his counsel, Harry Eigner, that he would require hotel bills, automobile rental bills, calendars, memos, or diaries to substantiate the claimed travel for Hicks and Lynn.

Subsequent to the December 3, 1959, and March 2, 1960, conferences where travel was mentioned by Special Agent Ansbigian, Thomas Wheeler filed his original 1959 return, including the $8,000 received from Lynn as "Other Income" and clarifying the $8,000 as a travel advance.

Wheeler Rocket Corp. was incorporated in Delaware by a certificate of incorporation which was executed on February 9, 1959. It was formed for the purpose of acquiring the land and buildings of the Oerlikon Tool & Arms Corp. of America in Asheville, N.C.

Wheeler Rocket Corp. has 1 million authorized shares of $1 par common stock, 80,002 of which were issued and outstanding and held as follows:

| Shareholder | Number of shares |
|---|---|
| M. Iurascu | 40,000 |
| Lynn | 40,002 |
| Total | 80,002 |

Oerlikon Tool & Arms Corp. of America is a wholly owned subsidiary of a Swiss corporation named Oerlikon Machine Tool Works Administration Co. of Zurich, Switzerland. The capital of Wheeler Rocket Corp. was $200,000, supplied by M. Iurascu and Hicks.

By an agreement dated February 21, 1959, Wheeler Rocket Corp. purchased all of the assets of Oerlikon Tool & Arms Corp. of America, including the real estate, for the purchase price of $2,525,000.

In order to execute the February 21, 1959, agreement between Wheeler Rocket Corp. and Oerlikon, Thomas Wheeler, along with Peter F. Coogan, an attorney, traveled to Zurich, Switzerland.

By an agreement dated June 10, 1959, Celanese Corp. of America agreed to purchase the issued and outstanding stock of Wheeler Rocket Corp.

Wheeler Rocket Corp.'s only material asset was the February 21, 1959, agreement or contract to purchase the assets of Oerlikon. Its only liability, as of June 10, 1959, was "its indebtedness for services rendered to it and expenses in the aggregate amount of $150,000, and its obligation under the [Oerlikon] contract."

By a document executed September 1, 1959, Celanese incorporated API, Inc., through which the stock of Wheeler Rocket Corp. was to be channeled to Celanese.

Each of the persons or entities that was involved in the series of transactions, which have been referred to as the "Celanese Transaction," submitted invoices to Wheeler Rocket Corp. in the total amount of $150,000, as follows:

| | | | |
|---|---|---|---|
| Hicks Corp | $15,000 | Thomas Wheeler | $24,500 |
| Lynn Corp | 42,100 | M. Iurascu | 25,000 |
| John Reimers | 3,000 | Ropes & Gray | 35,000 |
| Maurice Porter | 4,400 | | |
| M. C. Cohen | 1,000 | Total | 150,000 |

Thomas Wheeler submitted an invoice dated September 9, 1959, to Wheeler Rocket Corp. for $24,500, with the following explanation:

FOR EXPENSES in connection with the acquisition by your corporation of stock and debentures of Oerlikon Tool & Arms Corporation of America (now Amcel Propulsion Inc.), including negotiations in this country and in Zurich, Switzerland on the proposed acquisition and proposed methods of financing the acquisition; discussions with representatives of your company; preparation of the purchase and sale agreement between Oerlikon Machine Tools Works Administration Co., Oerlikon Tool & Arms Corporation of America and your company dated February 21, 1959; including disbursements for travel, long distance telephone calls, and miscellaneous _____ $24,500

The $150,000 of invoices submitted to Wheeler Rocket Corp. was to reimburse all of the acquisition expenses of the "Celanese Transaction."

No invoices were submitted by Thomas Wheeler to anyone else on the "Celanese Transaction." The Swiss hotel bill, in the amount of $1,121, for Thomas Wheeler was paid for by Hicks. His air travel to and from Zurich, Switzerland, was paid for by Hicks.

Shirley Wheeler accompanied Thomas Wheeler on the Swiss trip concerning the "Celanese Transaction." Attorney Peter F. Coogan traveled to Zurich, Switzerland, with his 12-year-old son concerning the "Celanese Transaction."

In addition to traveling to Zurich, Switzerland, on the "Celanese Transaction," Thomas Wheeler also went to Rome, Italy, Naples, Italy, Paris, France, and London, England, on the same ticket.

The Hicks Corp. paid for most of Thomas Wheeler's expenses in connection with the travel incurred for the "Celanese Transaction."

Thomas Wheeler took the $24,500 he had received from Wheeler Rocket Corp. and paid it into Lynn, and an account payable to Thomas Wheeler in the amount of $24,500 was set up on Lynn's books.

When Thomas Wheeler filed his original 1959 Federal income tax return, he reported $15,200 of the $24,500 as "Other Income." The difference between the $24,500 received by Thomas Wheeler and the $15,200 reported on his original 1959 return is $9,300, which amount had been deducted by Thomas Wheeler to arrive at the $15,200.

In addition to Thomas Wheeler deducting the $9,300, it was also deducted on the books and records of Lynn and on its tax return for the fiscal year ended July 31, 1959.

Without receiving documentation and at Thomas Wheeler's direction, Raymond L. White recorded an entry on Lynn's general journal to set up $12,000 of accrued travel expenses on July 31, 1959, as follows:

| | |
|---|---|
| March | $9,300 |
| April | 890 |
| May | 1,330 |
| June | 480 |
| Total | 12,000 |

The $12,000 was posted to the travel expense account of Lynn and constituted a part of the $20,852.29 balance in that account which was deducted on Lynn's return for the taxable year ended July 31, 1959.

Special Agent Ansbigian was not shown "Expense Accounts" and/or travel vouchers for any of the four items making up the claimed $12,000 travel deduction. No part of the $12,000 was ever paid by Lynn.

Thomas Wheeler, on his amended 1959 Federal income tax return filed November 1, 1962, reported the entire $24,500 as income.

The reporting of the entire $24,500 received from Wheeler Rocket Corp. by Thomas Wheeler is an admission that no part of it was expended by him for business purposes.

By Lynn check numbered 152, $49.50 was paid to the Tree Top Lodge in New Hampshire for Thomas Wheeler's stay there on August 14 through August 17, 1958, for which no business purpose has been shown.

By Lynn check numbered 153, $250 was paid to Thomas Wheeler for travel expense for which there was no voucher and/or "Expense Account."

Both the $49.50 and the $250 were posted to the travel expense account of Lynn and were part of the $20,852.29 balance deducted on Lynn's return for the taxable year ended July 31, 1959.

The $8,000 accrued and unpaid travel expense; $12,000 accrued, unpaid, and duplicated travel expense; and the $250 and $49.50 travel expenses make up the $20,299.50 adjustment shown in respondent's notice of deficiency for Lynn dated April 8, 1969, and in respondent's amendment to answer filed with the Court on June 10, 1970.

*Lynn—FYE July 31, 1959, Bad Debt—$6,918.62*

Raymond L. White, at Thomas Wheeler's direction, reflected a loss attributable to Lynn's Norfolk Supply account, in the amount of $6,918.62, in the general journal. Such amount was the balance of the Norfolk Supply Co. account payable on the books of Lynn. The $6,918.62 was deducted as part of the $11,182.62 loss claimed on Lynn's return for the taxable year ended July 31, 1959.

On April 27, 1956, Lynn advanced $20,712.69 to Norfolk Supply Co., Inc., a shell corporation of Lynn, for the purpose of acquiring three parcels of land; 2, 4, and 6 New Street, East Boston, Mass.

Norfolk Supply Co., Inc., was a shell company. It had no books of account and filed no income tax returns for the years 1955 through 1960 and had no employees.

Norfolk paid the $20,712.69 to The Woods Hole Oceanographic Institution in exchange for a deed to the 2, 4, and 6 New Street property, dated April 27, 1956, and filed with the Suffolk Registry of Deeds on May 1, 1956.

Border Industries, Inc., filed its final return for the taxable period May 1, 1955, to October 1, 1956, with the statement therein that "The business of this corporation has been completed." Border Industries, Inc., was a shell company and did not file income tax returns for the taxable years 1956 through 1960.

The Middle Corp. was incorporated on December 31, 1957, by means of articles of organizations executed December 26, 1957. It was a shell

company and did not file income tax returns for the taxable years 1956 through 1960.

By deeds filed December 31, 1957, the same day as the incorporation of the Middle Corp., Norfolk conveyed 4 New Street to the Middle Corp. and 6 New Street to Border Industries, Inc. Norfolk retained title to 2 New Street. There are no transfer stamps on the deeds from Norfolk to Border and Middle evidencing an absence of consideration.

By an indenture dated December 23, 1958, easements and rights-of-way were exchanged between Norfolk Supply Co., Inc., Border Industries, Inc., and the Middle Corp. regarding 2, 4, and 6 New Street.

The officers of Norfolk Supply Co., Inc., Border Industries, Inc., and the Middle Corp. were Thomas Wheeler and Raymond L. White.

By deed dated December 23, 1958, and recorded February 5, 1959, Norfolk and Middle conveyed 2 and 4 New Street to Arthur Bimbo and Leonard J. Hughes d.b.a. Harbor View Marina and Boatel.

The deed to Bimbo and Hughes was executed on behalf of Norfolk by Thomas Wheeler, its president, and on behalf of Middle by Raymond L. White, its president. In exchange for the deed to 2 and 4 New Street, Bimbo and Hughes paid $2,500 in cash and gave their note for $75,000.

Norfolk, Border and Middle corporations had no books and records for the years involved, and since they were shell corporations of Lynn and/or Thomas Wheeler, all of the events concerning the New Street properties were recorded on the books of Lynn.

Bimbo and Hughes d.b.a. Harbor View Marina and Boatel, executed a mortgage deed to Norfolk and Middle corporations to secure payment of the $75,000 note.

The $75,000 note from Messrs. Bimbo and Hughes bore interest at a rate of 6 percent per annum.

The receipt of the $75,000 note from Messrs. Bimbo and Hughes is reflected on page 47 of Lynn's general journal in an entry dated December 5, 1958.

Lynn paid the real estate taxes for 2, 4, and 6 New Street for the years 1957 and 1958. After the sale of 2 and 4 New Street, Lynn continued to pay the taxes on 6 New Street. Lynn deducted the real estate taxes paid on 2, 4, and 6 New Street on its income tax returns. Lynn paid the accrued taxes on 2, 4, and 6 New Street through 1956.

Thomas Wheeler told Special Agent Ansbigian that Norfolk, Border and Middle were shells merely used for convenience to hold title and to limit liabilities.

Lynn did not consider Norfolk, Border, and Middle corporations as separate entities apart from Lynn, as indicated by the entries concerning the New Street transactions on the books of Lynn.

Lynn, in effect and substance, owned 2, 4, and 6 New Street and did not owe itself money.

Lynn and/or Border owned 6 New Street when Lynn wrote off the $6,918.62 as a bad debt.

Six New Street was an asset with value on July 31, 1959, and shown on the City of Boston's tax assessment records in the amount of $25,000 (land—$21,000 and buildings—$4,000).

The $6,918.62 was an improper deduction made at the direction of Thomas Wheeler.

*Thomas Wheeler and Shirley Wheeler—1957 Lynn Travel Expense—$8,047.88*

Thomas Wheeler submitted a $1,300 "Expense Account" to Lynn for the month of April 1957 for which he was paid by Lynn check numbered 23432, in the amount of $1,300, during the taxable year 1957. Thomas Wheeler did not perform the travel shown on the April 1957 "Expense Account" he submitted to Lynn. He expended the $1,300 for nonbusiness or personal purposes. He did not report the $1,300 fictitious travel reimbursement on his 1957 income tax return.

During the taxable year 1957, Thomas Wheeler submitted a fictitious "Expense Account" in the amount of $3,800 to Lynn for the 6 months ended July 31, 1957, and received the proceeds of a $3,800 Lynn check numbered 27. The $3,800 received by Thomas Wheeler was not expended for business travel or other deductible expenses. He did not report the $3,800 fictitious travel reimbursement on his 1957 income tax return.

During his taxable year 1957, Thomas Wheeler caused Raymond L. White to submit a $2,217.88 "Expense Account" to Lynn reflecting travel which was not performed by Raymond L. White and to remit the proceeds of Lynn's check numbered 37, in the amount of $2,217.88, to Thomas Wheeler. Thomas Wheeler did not report the $2,217.88 fictitious travel reimbursement on his 1957 income tax return.

During his taxable year 1957, Thomas Wheeler submitted an "Expense Account" to Lynn for travel he did not perform during 1957 and was paid $730 by means of Lynn check numbered 43, dated October 4, 1957. The $730 was not expended by Thomas Wheeler for business or any other tax deductible purpose. Thomas Wheeler did not report the $730 fictitious travel reimbursement on his 1957 income tax return.

The fictitious reimbursed travel expenses paid to Thomas Wheeler during his taxable year 1957, in the amounts of $1,300, $3,800, $2,217.88, and $730, total $8,047.88, which total is a part of the $19,047.88 adjustment made in the notice of deficiency to Thomas Wheeler and Shirley Wheeler concerning amounts received from Lynn.

*Thomas Wheeler and Shirley Wheeler—1957 Lynn Office Salaries—$3,500*

During his taxable year 1957, Thomas Wheeler caused Raymond L. White to draft a salary and/or bonus check, in the amount of $3,500, to Raymond L. White and to turn the proceeds of same over to Thomas Wheeler. Thomas Wheeler received the $3,500. He instructed White to report it on his Federal income tax return, and White did so. Wheeler did not report any of the $3,500 on his 1957 Federal income tax return. The $3,500 is part of the $19,047.88 adjustment made in the notice of deficiency to Thomas Wheeler and Shirley Wheeler concerning amounts received from Lynn during 1957.

*Thomas Wheeler and Shirley Wheeler—1957 Lynn Professional Services—$7,500*

During Thomas Wheeler's taxable year 1957, Lynn paid attorney Joseph L. Dupont $3,000 for representing Thomas Wheeler in his personal divorce with Ruby P. Wheeler. Thomas Wheeler did not report as income the $3,000 paid Joseph L. Dupont by Lynn during the taxable year 1957.

During Thomas Wheeler's taxable year 1957, Lynn paid attorney Samuel Cohen $2,000 for representing Thomas Wheeler in his personal divorce with Ruby P. Wheeler.

Thomas Wheeler did not report as income the $2,000 paid Samuel Cohen by Lynn during the taxable year 1957.

In addition to Lynn deducting the $2,000 paid to attorney Samuel Cohen on its return for the taxable year ended July 31, 1957, Thomas Wheeler also deducted the same $2,000 payment as part of a $4,500 deduction on his 1957 return.

During Thomas Wheeler's taxable year 1957, Lynn paid attorney Talcott M. Banks, Jr., $2,500 for representing Ruby P. Wheeler in her divorce action against Thomas Wheeler. Thomas Wheeler was obligated, by court order, to make the nondeductible payment to attorney Banks. Thomas Wheeler did not report as income the $2,500 paid Ruby P. Wheeler's attorney, Talcott M. Banks, Jr., by Lynn during the taxable year 1957.

The $3,000, $2,000, and $2,500 paid by Lynn as fees to attorneys in Thomas Wheeler's personal divorce action constitute the $7,500 total which is a part of the $19,047.88 adjustment to income in Thomas and Shirley Wheeler's notice of deficiency.

The $8,047.88 fictitious Lynn travel reimbursements to Thomas Wheeler; $3,500 from Raymond L. White to Thomas Wheeler; and the $7,500 payments to attorneys for Thomas Wheeler's personal divorce proceeding total $19,047.88, and constitute the 1957 adjustment to

Thomas Wheeler's and Shirley Wheeler's income attributable to unreported amounts received from Lynn.

*Thomas Wheeler and Shirley Wheeler—1958 Lynn Travel Expense—$1,979.50*

During Thomas Wheeler's taxable year 1958, he submitted a false "Expense Account" to and received reimbursement from Lynn in the amount of $1,270.

During Thomas Wheeler's taxable year 1958, he submitted a false "Expense Account" to and received reimbursement from Lynn in the amount of $410.

During 1958, Lynn paid $49.50 to the Tree Top Lodge in New Hampshire for Thomas Wheeler's visit there, which was not a business trip.

During Thomas Wheeler's taxable year 1958, he received $250 from Lynn for which no voucher or "Expense Account" was submitted and no travel had been performed for Lynn.

The $1,270, $410, and $250 travel reimbursements from Lynn for which no travel was performed and/or no "Expense Account" submitted and the $49.50 Tree Top Lodge personal expense of Thomas Wheeler were not reported as income by Thomas Wheeler on his 1958 income tax return.

The $1,270, $410, $250, and $49.50 improper payments from Lynn to or on behalf of Thomas Wheeler comprise the $1,979.50 adjustment in Thomas and Shirley Wheeler's notice of deficiency attributable to unreported amounts received by Thomas Wheeler from Lynn for 1958.

*Thomas Wheeler—1956 Hicks Travel Reimbursement—$6,005.60*

Thomas Wheeler, during his taxable year 1956, received travel reimbursement checks from Hicks concerning its taxable year beginning May 1, 1956, in the total amount of $10,273.

Thomas Wheeler and/or Hicks did not provide Special Agent Ansbigian with substantiation and/or supporting documentation of Thomas Wheeler's "Expense Accounts" for 1956, 1957, 1958, and 1959 by which they could be verified.

Since Thomas Wheeler and/or Hicks failed to maintain and/or submit adequate records to respondent, Special Agent Ansbigian reconstructed Thomas Wheeler's travel expense for the taxable years, 1956, 1957, 1958, and 1959.

Special Agent Ansbigian, by means of his reconstruction, determined that Thomas Wheeler's allowable travel for Hicks, attributable to the $10,273 for 1956, was $4,267.40.

Special Agent Ansbigian's reconstruction of Thomas Wheeler's Hicks travel for 1956, 1957, 1958, and 1959 was prepared at the time of the income tax investigation.

In reconstructing Thomas Wheeler's travel expenses for 1956, 1957, 1958, and 1959, Special Agent Ansbigian prepared schedules with columns corresponding to those shown on Wheeler's "Expense Accounts." The columns were "Hotel," "Meals," "Conferences," and "Tips," all of which were in Special Agent Ansbigian's reconstruction, plus a column for "Auto Expense." Ansbigian had access to the bills and receipts that could be produced from Hicks' files. Whenever Ansbigian found a bill, he would contact the hotel, auto rental, etc., and ask for a complete record of Thomas Wheeler's stay or use for the years involved. Ansbigian would place Thomas Wheeler away from home in travel status for the period indicated on each bill.

Thomas Wheeler's "Expense Accounts" consisted of alleged expenses, in round amounts, and they reflect a regular pattern of charges for hotel, meals, conferences, and tips, which Special Agent Ansbigian would allow for each day Wheeler could be placed in travel status. The airline statements and transportation receipts were the principal method by which Ansbigian would place Wheeler in travel status. Ansbigian would place Wheeler in travel status from the date Wheeler acquired the airline ticket until he left Boston again or some evidence existed that Wheeler had returned to Boston.

Special Agent Ansbigian's reconstruction was prepared during the income tax investigation of Thomas Wheeler and is included in this record. Ansbigian had copies of the documents used to reconstruct Thomas Wheeler's travel for Hicks for 1956, 1957, 1958, and 1959 and was subject to full and complete cross-examination.

Having determined that Thomas Wheeler's travel for the period May 1, 1956, through December 31, 1956, generated $4,267.40 in reimbursable expenses out of the $10,273 received by Thomas Wheeler, Special Agent Ansbigian determined that $6,005.60 was not expended for travel by Wheeler. The $6,005.60 excess travel reimbursement was not reported on Thomas Wheeler's 1956 Federal income tax return.

Thomas Wheeler failed to report a $494.84 capital gain on his 1956 Federal income tax return.

*Thomas Wheeler—1957 Hicks—Excess Travel Reimbursement and Personal Expenses Paid for by Hicks—$17,274.75*

During his taxable year 1957, Thomas Wheeler received $26,153 in travel reimbursement checks from Hicks.

Special Agent Ansbigian determined, by means of reconstruction identical to that used for the year 1956, that Thomas Wheeler's allowable travel reimbursement for 1957 from Hicks was $9,943.40.

Having determined that $9,943.40 of travel was allowable out of $26,153 received by Thomas Wheeler during 1957, Special Agent Ansbigian determined that $16,209.60 was not expended for travel by Thomas Wheeler. Wheeler did not report the $16,209.60 excess travel reimbursement on his 1957 Federal income tax return.

During the taxable year 1957, Hicks paid $317.05 for alleged business travel by Shirley Wheeler, and it has not been shown that such travel was ordinary and necessary and not the personal expense of Thomas Wheeler or Shirley Wheeler.

During the taxable year 1957, Hicks paid florist bills in the amount of $5.90 for the personal benefit of Thomas Wheeler. Wheeler did not include the $5.90 paid by Hicks on his 1957 Federal income tax return.

During the taxable year 1957, Hicks paid a lodging bill for Thomas Wheeler and family in the amount of $742.20. The $742.20 paid by Hicks during 1957 was a personal expense of Thomas Wheeler, and he did not report it on his Federal income tax return for 1957.

### *Thomas Wheeler—1957 Legal Fees—Divorce—$4,500*

During 1957 Thomas Wheeler paid Talcott M. Banks $2,000 by means of a personal check to Samuel Cohen which Mr. Cohen endorsed to Banks.

During 1957 Lynn paid Talcott M. Banks $2,500 by means of a check to Samuel Cohen which Mr. Cohen endorsed to Banks' law firm.

Thomas Wheeler deducted the $2,000 and $2,500 legal fee payments to Talcott M. Banks on his 1957 Federal income tax return in the total amount of $4,500.

Both Thomas Wheeler and Lynn attempted to deduct the $2,500 payment to Talcott M. Banks during 1957.

Thomas Wheeler knew that legal fees for an attorney adverse to his cause in divorce proceedings are not deductible.

### *Thomas Wheeler—1958—Excess Travel Reimbursement and Personal Expenses Paid for by Hicks—$3,857.69*

During 1958 Thomas Wheeler received travel reimbursement checks from Hicks in the total amount of $10,898.

During 1958 Hicks paid $797.24 for alleged business travel of Shirley Wheeler. It has not been shown that Shirley Wheeler's travel was ordinary and necessary and not personal.

Special Agent Ansbigian determined, by means of a reconstruction consistent with those compiled for earlier years, that the allowable

travel reimbursement for Thomas Wheeler and Shirley Wheeler during 1958 was $7,948.74.

Of the total travel reimbursement received by Thomas and Shirley Wheeler, in the amount of $11,695.24, only $7,948.74 was expended for business travel and $3,746.50 was expended for personal purposes. Thomas and Shirley Wheeler did not report the $3,746.50 excess travel reimbursement on their 1958 Federal income tax return.

During 1958 Hicks paid an electrician $57.59 to perform electrical work at the personal residence of Thomas Wheeler's mother.

During 1958 Hicks paid Thomas Wheeler's personal florist bills in the total amount of $53.60. The recipients of the flowers paid for by Hicks during 1958 were Thomas Wheeler's mother and wife.

Thomas Wheeler did not report the $57.59 and $53.60 paid by Hicks for Thomas Wheeler's personal expenses on his 1958 Federal income tax return.

During 1958 Thomas and Shirley Wheeler received $246.68 in interest on a refund from the Federal Government on their 1957 Federal income tax return. Thomas and Shirley Wheeler did not report the $246.68 interest received on their 1958 Federal income tax return.

*Thomas Wheeler—1959 Hicks Excess Travel Reimbursement— $1,680.95*

From January 1, 1959, through April 30, 1959, Thomas Wheeler received $3,422 in travel reimbursements from Hicks. Special Agent Ansbigian, by means of his consistently applied reconstruction, determined that Thomas Wheeler's allowable travel for Hicks during the period January 1, 1959, through April 30, 1959, was $1,741.05. Thomas Wheeler received $1,680.95 excess travel reimbursement from Hicks during 1959 which he did not report on his 1959 or 1959 amended Federal income tax returns.

During 1959 Hicks paid Shirley Wheeler $499.97 travel reimbursement for which it has not been shown that she traveled or that the alleged travel was ordinary and necessary and not personal.

During 1959 Thomas Wheeler received $24,500 from Wheeler Rocket Corp., for his involvement in the "Celanese Transaction," but he only reported $15,200 on his original 1959 Federal income tax return. Since Hicks had paid for most of Wheeler's expenses in connection with the "Celanese Transaction," Wheeler reported the additional $9,300 on his amended 1959 Federal income tax return.

Hicks paid for Thomas Wheeler's air travel to New York during the period in 1959 that he traveled to negotiate the "Celanese Transaction."

All of the air trips to New York for the period January 1, 1959, through April 30, 1959, were allowed by Special Agent Ansbigian in

his reconstruction of Thomas Wheeler's Hicks travel, including hotel, meals, conferences, and tips.

### Other Facts Relating to Travel Expenses

Thomas Wheeler claimed to be in travel status 7 days per week.

Helen Harney worked for Hicks as a filing clerk during 1957, secretary during 1958 and 1959, and late in 1959 she became Thomas Wheeler's secretary. During 1965, while employed by Hicks and Lynn, Helen Harney, by means of examining documents, constructed "supporting schedules" or "reconstruction vouchers" concerning Thomas Wheeler's travel during 1956, 1957, 1958, and 1959. Helen Harney was told by Thomas Wheeler that he traveled by train, but she saw no evidence of it. Helen Harney would allow Thomas Wheeler amounts for taxi and tips although she saw no bills or did not know he traveled by taxi or paid a tip.

Thomas Wheeler and John Dusenbery decided not to put specific dates on Thomas Wheeler's travel even though they were available.

Helen Harney included amounts for hotel rooms even though Hicks may have paid the bill, or Thomas Wheeler may not have stayed in a location overnight.

Whenever any correspondence mentioned a city other than Boston, Helen Harney would place Thomas Wheeler there on travel without her actually knowing he was there.

Helen Harney did not check to see if hotel bills were paid by Hicks on behalf of Thomas Wheeler.

### Gain From Sale of 2 and 4 New Street Property

The $61,999.24 profit from the sale of 2 and 4 New Street was placed on Lynn's return for the taxable year ended July 31, 1959, under "Paid-in capital or surplus," line 21 of the Schedule L balance sheet.

There is no mention of an installment sale or "deferred profit" on Lynn's return for the taxable year ended July 31, 1959.

Harry Eigner, C.P.A., would not have known of an installment sale from Lynn's return for the taxable year ended July 31, 1959, without looking at the books.

There is no listing or mention of "New Street" or any sales on Lynn's return for its taxable year ended July 31, 1959.

The $75,000 note from Bimbo and Hughes was a negotiable and secured note. No evidence was submitted that would place the value of the $75,000 note at less than its face.

Lynn failed to report a $61,719.17 gain from the sale of 2 and 4 New Street during its taxable year ended July 31, 1959.

*Facts Relating to Criminal Tax Case*

In 1964, Thomas Wheeler was convicted by a jury in the U.S. District Court for the District of Massachusetts in Criminal Case No. 63–163–F of the willful evasion of the payment of Federal income taxes due and owing to the United States by him and his wife for the year 1957, and of willful evasion of tax due and owing to the United States by S. D. Hicks & Son Co., and the Lynn Corp. for the fiscal years ended July 31, 1957, July 31, 1958, and July 31, 1959.

Raymond L. White's testimony at the criminal trial lasted over 2 days and was recorded on 279 pages of transcript. Of the 279 pages, 82 pages comprised the direct and redirect examinations and 197 pages comprised the cross- and recross-examinations. About 70 percent of White's lengthy testimony was cross-examination by attorney John M. Doukas who represented Thomas Wheeler in the criminal case and in these cases.

The U.S. Court of Appeals for the First Circuit reversed the judgment of conviction, set aside the verdict, and remanded the case for a new trial. Its opinion of October 26, 1965, is reported as *Wheeler* v. *United States*, 351 F. 2d 946. The Court of Appeals reversed and remanded on the sole ground that the defendant's attorney should have been allowed by the trial judge to inquire whether Raymond L. White had a pecuniary interest in the outcome of the criminal case.

On December 6, 1966, Thomas Wheeler entered a plea of nolo contendere which was accepted by the U.S. District Court for the District of Massachusetts in Criminal Case No. 63–163–F of the offense of "wilful evasion of income tax due and owing to the United States of America by him and his wife for the calendar year of 1957; and of wilful evasion of the income tax due and owing to the United States of America by S. D. Hicks & Son Co., and The Lynn Corporation (formerly S. D. Hicks & Son Co.), for the fiscal years ending July 31, 1957, July 31, 1958, and July 31, 1959 as charged in counts 1, 2, 3, and 4 of the Indictment." As a result of Thomas Wheeler's plea in Criminal Case No. 63–163–F, he was adjudged "guilty as charged and convicted" and "ordered to pay a fine of $2,500 on count 1, and on count 2, to pay a fine of $2,500 and on count 3, to pay a fine of $2,500 and on count 4 to pay a fine of $2,500."

Some time after Thomas Wheeler was found guilty in the criminal case and before the trial of the instant cases, Raymond L. White became mentally incapacitated and unable to testify. When the instant cases were tried Raymond L. White was 72 years old and had been confined in the Veterans Administration Psychiatric Hospital, Bedford, Mass., for 2 years. Dr. E. W. Keil, chief of staff of the Veterans

Hospital certified that Raymond L. White was incompetent and unable to appear and testify in this Court.

*Miscellaneous*

No evidence was submitted to prove that Lynn was entitled to deductions for Massachusetts corporate excise tax in excess of $3,050.60 and $550.02 for its taxable years ended July 31, 1957, and July 31, 1958, respectively.

No evidence was submitted to prove that Lynn was entitled to deductions for Asheville, N.C., real estate taxes in excess of $517.47 and $29.06 for its taxable years ended July 31, 1957, and July 31, 1958, respectively.

No evidence was submitted to show that $70.92 of depreciation should not be disallowed Lynn for its taxable year ended July 31, 1958.

No evidence was submitted to negate that Lynn had unreported income during its taxable year ended July 31, 1958, attributable to the sale of two boilers and a compressor in the amounts of $1,500 and $278.13, respectively.

No evidence was submitted to negate that Lynn had unreported income in the amount of $33,143.87 attributable to excess insurance reimbursement during its taxable year ended July 31, 1958.

No evidence was submitted to show that Lynn's deductible Boston, Mass., real estate tax was in excess of $16,702.80 for its taxable year ended July 31, 1958.

No evidence was submitted to show why Lynn should not have included in its income a $2,490.87 refund of Massachusetts corporate excise tax received during its taxable year ended July 31, 1958, and deducted in years prior thereto.

#### ULTIMATE FINDINGS

1. For each of the taxable years ended July 31, 1957, July 31, 1958, and July 31, 1959, a part of the underpayment of tax by Lynn, acting through its officers, was due to fraud with intent to evade tax, and each of its Federal corporation income tax returns for those years was a false and fraudulent return.

2. For each of the years 1956 through 1959 a part of the underpayment of tax by the petitioner Thomas Wheeler was due to fraud with intent to evade tax, and each of his Federal income tax returns for those years was a false and fraudulent return.

#### OPINION

1. *Testimony of nonparty witness given at prior criminal trial.*— A preliminary, yet key, question presented is whether the record of

the testimony of Raymond L. White, who was the chief prosecution witness in the 1964 criminal income tax evasion trial involving Thomas Wheeler and the Lynn Corp., is admissible in evidence in these proceedings. Our findings contain the facts and circumstances surrounding the occasion of White's testimony in the criminal trial. Wheeler was found guilty by the jury. The conviction was appealed and the Court of Appeals reversed and remanded the case for a new trial. *Wheeler* v. *United States*, 351 F. 2d 946 (C.A. 1, 1965). The Court of Appeals stated that "White's testimony, if believed, was sufficient to convict the appellant [Thomas Wheeler] on each count." The "counts" consisted of willful evasion of income tax of Thomas Wheeler and his wife for 1957 and of the Lynn Corp. for its fiscal years ended July 31, 1957, through July 31, 1959. Respondent contends that White's testimony also included fraudulent items concerning Thomas Wheeler's taxable years 1958 and 1959 and would likewise be sufficient to support a finding of fraud for those years. White's testimony also covers certain fictitious travel items of Thomas Wheeler for 1958 and the $9,300 Wheeler Rocket deduction. Petitioners' attorney strongly objected to the admission of White's former testimony as being hearsay. The objection was overruled and White's former testimony was admitted in evidence. Petitioners' counsel again vigorously argues on brief that White's former testimony is inadmissible and the Court should place no reliance upon it. Respondent counters in his brief with extensive arguments for admissibility.

Upon further consideration and reflection we still think such testimony is admissible. In our opinion several avenues of admission of White's former testimony into evidence are available to us, and any or all of these means may be utilized. They are:

A. *Raymond L. White's former testimony is admissible in evidence pursuant to section 7453 of the Internal Revenue Code of 1954 and Rule 31 (a) of the Court's Rules of Practice and statutes incident thereto.*—The admissibility of the former testimony of a nonparty witness can be supported by following the natural sequence of evidentiary rules established for cases in the United States Tax Court.

Congress established the guide for rules of practice, procedure, and evidence by enacting section 1111 of the Internal Revenue Code of 1939, restating section 1111 as section 7453 of the Internal Revenue Code of 1954, and amending it in section 960 (f) of Public Law 91–172, December 30, 1969, to read as follows:

Except in the case of proceedings conducted under section 7463, the proceedings of the Tax Court and its divisions shall be conducted in accordance with such rules of practice and procedure (other than rules of evidence) as the Tax Court may prescribe and in accordance with the rules of evidence applicable in trials without a jury in the United States District Court of the District of Columbia.

In turn, this Court promulgated Rule 31(a) of its Rules of Practice, which states:

The trials before the Court and its Divisions will be conducted in accordance with the rules of evidence applicable in trials without a jury in a United States District Court for the District of Columbia. With reference to the examination of unwilling or hostile witnesses, see Rule 43(b) of the Rules of Civil Procedure for the United States District Courts.

The rules of evidence applicable in the U.S. District Court for the District of Columbia are subject to the Federal Rules of Civil Procedure, as indicated in Rule 1, 28 U.S.C., as follows:

These rules govern the procedure in the United States district courts in all suits of a civil nature whether cognizable as cases at law or in equity or in admiralty, with the exceptions stated in Rule 81. They shall be construed to secure the just, speedy, and inexpensive determination of every action. As amended Feb. 28, 1966, eff. July 1, 1966.

Rule 83 of the Federal Rules of Civil Procedure, 28 U.S.C., provides:

Each district court by action of a majority of the judges thereof may from time to time make and amend rules governing its practice not inconsistent with these rules. Copies of rules and amendments so made by any district court shall upon their promulgation be furnished to the Supreme Court of the United States. In all cases not provided for by rule, the district courts may regulate their practice in any manner not inconsistent with these rules.

It is clear that the Federal Rules of Civil Procedure are applicable "in all suits of a civil nature" in the District Courts; and that no District Court may make or amend rules governing its practice which are inconsistent with the Federal Rules of Civil Procedure. In view of the fact that Rule 43(a) of the Federal Rules of Civil Procedure specifically regulates the admissibility of evidence, such rule would necessarily be "applicable in trials without a jury in the United States District Court of the District of Columbia," and accordingly in trials in the United States Tax Court. The District Court of the District of Columbia would not have the power to make any rules governing the admissibility of evidence which are inconsistent with Rule 43(a).

Section 14-303, District of Columbia Code, permits the admission of the prior testimony of a since-deceased or incompetent party under certain prescribed conditions. There is no statutory authority in the District of Columbia Code for the introduction of prior testimony of a witness, as distinguished from a party.

Rule 43(a) of the Federal Rules of Civil Procedure, 28 U.S.C., provides that:

In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules. All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general

jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made. The competency of a witness to testify shall be determined in like manner.

By its terminology, Rule 43(a) is a rule of admissibility, not a rule of exclusion. It has been the subject of much judicial interpretation. In *Monarch Insurance Co. of Ohio* v. *Spach*, 281 F. 2d 401, 411 (C.A. 5, 1960), Rule 43(a) was described in the following terms:

It does speak in affirmative terms of admissibility, not exclusion. It defines the three standards for admissibility. But it does not purport to prohibit the admission of other relevant material probative evidence which, in the considered exercise of judicial wisdom, is *trustworthy. There are probably few instances in which evidence proffered will not come within the three categories or*, on the other hand, be expressly excluded. [Emphasis added.]

Certainly evidence is trustworthy where, as here, it was received during a criminal trial in the U.S. District Court under established procedures designed to protect the defendant's basic rights and subject to searching cross-examination.

The rationale of *Spach* was followed by the Court of Appeals for the Fifth Circuit in *Dallas County* v. *Commercial Union Assurance Co.*, 286 F. 2d 388, 394–395 (C.A. 5, 1961), where it stated:

Rule 43(a) affirmatively expands the scope of admissibility. It is a rule of admissibility, not exclusion. Although the rule specifies three categories of evidence that shall be admitted, it does not prohibit the receipt of probative evidence outside the three categories * * *. Even if Rule 43(a) should be interpreted as carrying the necessary implication that evidence to be admissible must fit into one of the three categories specified in the rule, the cryptic reference to "rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity" is so uncertain in its meaning as to give broad latitude to a trial judge in his rulings on admissibility. The trial judge may exercise his discretion, if he keeps the hearing within reasonable bounds. In finding and applying rules of evidence applicable to hearings of suits in equity, his chief censor is the conscience of a Chancellor.

If they are worth their salt, evidentiary rules are to aid the search for truth. Rule 43(a) notwithstanding its shortcomings, carries out that purpose by enabling federal courts to apply a liberal, flexible rule for the admissibility of evidence, unencumbered by common law archaisms.

See also *National Surety Corporation* v. *Musgrove*, 310 F. 2d 256 (C.A. 5, 1962); *Hope* v. *Hearst Consolidated Publications, Inc.*, 294 F. 2d 681 (C.A. 2, 1961), certiorari denied 368 U.S. 956. Accordingly, it is our view that the prior testimony of a witness is admissible in the U.S. District Court for the District of Columbia, and is likewise admissible in the Tax Court.

B. *Raymond L. White's former testimony is admissible in evidence as a recognized exception to the hearsay rule or as not being hearsay.*—

Rule 63 of the Uniform Rules of Evidence defines hearsay as "evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated."

Former testimony has been classified as an exception to the hearsay rule or as a class of evidence in which the requirements of the hearsay rule are complied with. See 5 Wigmore, Evidence, sec. 1370 (3d ed. 1940), which states:

> Cross-examined Statements not an Exception to the Hearsay Rule. The Hearsay rule excludes testimonial statements not subjected to cross-examination (*ante*, § 1362). When, therefore, a statement has *already been subjected to cross-examination* and is hence admitted—as in the case of a deposition *or testimony at a former trial*, [Emphasis added.]—it comes in because the rule is satisfied,—not because an exception to the rule is allowed. The statement may have been made before the present trial, but if it has been already subjected to proper cross-examination, it has satisfied the rule and needs no exception in its favor.

Irrespective of the posture of former testimony as it relates to the hearsay rule, the requirements necessary to make it an exception to or not a part of the hearsay prohibition are present in these cases. The requirements for the admissibility of former testimony are generically as follows: (a) That it was given under oath and there was an opportunity to cross-examine (right of confrontation); (b) that there be an identity of the parties and/or issues; and (c) that the witness be unavailable.

First, White's testimony was under oath and subjected to extensive cross-examination by attorney John M. Doukas, the same attorney who represents petitioners in the instant cases. Except for the excluded question as to whether Raymond L. White was an informant or had claimed an informer's reward, neither the District Court nor the circuit court determined that any of the remaining cross-examination was limited in any way. Even if White had been shown to be an informant, his testimony would not have been disqualified or stricken. The question of pecuniary interest does not bear directly upon the truth or accuracy of the matters stated, but upon the weight to be given to the testimony. The record of White's testimony shows that all matters of his direct testimony were fully exposed to cross-examination. See *United States* v. *Toner*, 173 F. 2d 140 (C.A. 3, 1949); *Stephen* v. *United States*, 133 F. 2d 87 (C.A. 6, 1943). All petitioners have ever produced, at any time, as to whether Raymond L. White was an informant was an oral offer of proof at the criminal trial. Respondent, on the other hand, has presented clear and convincing evidence of the fact that White was not an informant and that he could not have had a pecuniary interest in the outcome of the criminal trial based upon an informer's reward. Since respondent has shown what White's answer to the excluded question would have been, we think White's cross-examination was not impaired.

Second, for evidentiary purposes the parties and the fraud issue in these cases are substantially identical to the parties and the fraud issue in the prior criminal case. Cf. *Hertz* v. *Graham*, 23 F.R.D. 17, 25 (S.D. N.Y. 1958), affirmed on this issue 292 F. 2d 443 (C.A. 2, 1961) ; *Fullerform Continuous Pipe Corp.* v. *American Pipe & Construction Co.*, 44 F.R.D. 453 (D. Ariz. 1968). Substantially the same arguments and factual positions asserted by the petitioners in these cases were taken in the criminal case.

Third, Raymond L. White was unavailable to testify in the instant cases. This is supported by undisputed evidence of his incapacity and confinement at the Veterans Administration Psychiatric Hospital.

C. *Raymond L. White's former testimony is admissible as though it were a deposition.*—Under this approach White's testimony at the criminal trial is admissible in evidence as if it were a deposition taken in Tax Court litigation. *Hertz* v. *Graham, supra;* Rule 43(a), Federal Rules of Civil Procedure; Rules 45 and 47, Tax Court Rules of Practice. In *Dyer* v. *Commissioner*, 352 F. 2d 948 (C.A. 8, 1965), affirming a Memorandum Opinion of this Court, the Court of Appeals made these comments upon the admissibility in evidence of the transcript of testimony at an earlier Tax Court trial (pp. 953–954) :

The taxpayer's second line of attack is that certain exhibits were erroneously admitted in evidence and that the record, appropriately deleted, would not support the Tax Court's findings. The exhibits so challenged are Exhibits * * * G (the stipulation and the transcript of oral testimony in the 1957 Tax Court file). The objections were on grounds of immateriality and irrelevancy and, although perhaps belatedly, hearsay.

* * * Their admission in evidence was not error.

In *Watsontown Brick Co.* v. *Hercules Powder Co.*, 265 F. Supp. 268 (M.D. Pa. 1967), affd. 387 F. 2d 99 (C.A. 3, 1967), the question was presented as to the admissibility in a second trial of testimony given by a witness at the first trial. On this issue the District Court stated (pp. 276–277) :

Under the Act of 1887, P.L. 158, § 9, 28 P.S. § 327, when a witness testified in a prior trial and was subject to cross-examination and he is not available for the second trial his testimony may be read. See Rule 43(a), Federal Rules of Civil Procedure.

John L. Romig, a former employee of Atlas Powder Company, testified in the first trial of this case in June 1965, and was extensively cross-examined by defendant. He is presently living outside the jurisdiction of this court and therefore was not amenable to a subpoena to testify at the trial. * * *

* * * * * * *

The Court did not err in admitting the testimony of John L. Romig given in the first trial.

In *Williams* v. *Cox*, 355 F. 2d 667 (C.A. 10, 1965), the court utilized Rule 26(d)(3) of the Federal Rules of Civil Procedure to sanction the

admissibility of former recorded testimony in the New Mexico State courts. The question was whether Williams was adequately represented by counsel when he entered a plea of guilty to a lesser charge of second-degree murder. Under the State court's ruling the former recorded testimony of an attorney was admitted because he lived more than 100 miles from the hearing. In affirming the lower court's finding, the Court of Appeals treated the former testimony as if it were a deposition.

Clearly the recorded testimony of a witness in a U.S. District Court before a judge and jury, where the parties are represented by counsel and there is an opportunity for full cross-examination meets the safeguards set forth in Rule 45 of this Court's Rules of Practice.

D. *The present state of the law favors the admission of former recorded testimony.*—Since *Ruch* v. *Rock Island*, 97 U.S. 693 (1878), the Supreme Court had consistently favored the admissibility of former testimony, and by its opinions has obviated the orthodox prohibitions against the use of former testimony. See also *Mattox* v. *United States*, 156 U.S. 237 (1895). The opinions of the Supreme Court continue through *California* v. *Green*, 399 U.S. 149 (1970), and numerous cases cited therein. In none of these opinions, even in criminal cases, has the Supreme Court prohibited former recorded testimony given under oath and subject to cross-examination.

In *United States* v. *Brown*, 411 F. 2d 1134 (C.A. 10, 1969), the Court of Appeals decided that transcripts of the interrogation or "question and answer" by special agents of third-party witnesses, who became incapacitated or died, were admissible as evidence submitted by the defendant in a criminal tax evasion case. In this rather far-reaching case, the Court of Appeals determined that transcripts of investigative questions and answers, without an attorney being present for the Government and not before a tribunal, were admissible evidence. In doing so, it relied, in part, on Rule 8–04 of the preliminary draft of proposed Rules of Evidence for the United States District Court, 46 F.R.D. 161, 377 (1969), which states:

(a) GENERAL PROVISIONS. A statement is not excluded by the hearsay rule if its nature and the special circumstances under which it was made offer strong assurances of accuracy and the declarant is unavailable as a witness.

(b) ILLUSTRATIONS. By way of illustration only, and not by way of limitation, the following are examples of statements conforming with the requirements of this rule:

(1) FORMER TESTIMONY. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another proceeding, at the instance of or against a party with an opportunity to develop the testimony by direct, cross, or redirect examination, with motive and interest similar to those of the party against whom now offered.

The Committee on Rules of Practice and Procedure of the Judicial Conference of the United States has proposed the codification of the liberalized use of former testimony. In the committee's notes to the instant proposed rule it is indicated that the witness' availability is not the relevant factor where the quality of his declaration (even hearsay) is at least as good as would be forthcoming if he took the stand. The only factor lost in the use of former testimony is the witness' demeanor.

Thus, we conclude that Raymond L. White's testimony meets all the requirements for admissibility. His testimony was subjected to a lengthy and rigorous cross-examination. Except for the exclusion of the collateral question concerning his status as an informant, White answered all questions asked of him, and if allowed to answer the excluded question, he would have replied in the negative. We have read his testimony carefully and we regard it as convincing with respect to the matters covered. We have relied upon it, in part, in making some of our findings of fact.[3]

2(a). *Fraud-Lynn Corporation.*—Section 6653(b) provides that 50 percent of the underpayment of tax shall be added to the tax if any part of the underpayment is due to fraud. The imposition of the addition to tax for fraud is based upon a state of mind, which is seldom susceptible of direct proof, but must be gleaned from all the facts and circumstances in the entire record. *M. Rea Gano*, 19 B.T.A. 518 (1930). Respondent, of course, bears the burden of proving fraud by clear and convincing evidence. *Arlette Coat Co.*, 14 T.C. 751 (1950); *Abraham J. Muste*, 35 T.C. 913 (1961).

It is clear that for purpose of fraud an understatement of taxes can be accomplished by an overstatement of deductions. See *Robert Neaderland*, 52 T.C. 532 (1969), affd. 424 F. 2d 639 (C.A. 2, 1970); *Estate of Louis L. Briden*, 11 T.C. 1095 (1948), affirmed sub nom. *Kirk* v. *Commissioner*, 179 F. 2d 619 (C.A. 1, 1950); and *John McKeon*, 39 B.T.A. 813 (1939).

A corporation can act only through its officers and "corporate fraud necessarily depends upon the fraudulent intent of the corporate officer(s)." *Irving S. Federbush*, 34 T.C. 740 (1960), affd. 325 F. 2d 1 (C.A. 2, 1963), *Auerbach Shoe Co.*, 21 T.C. 191 (1953), affd. 216 F. 2d 693 (C.A. 1, 1954).

On this record we are satisfied that the respondent has proved fraud by clear and convincing evidence. There are several "badges" of fraud.

---

[3] White's affidavit of Nov. 17, 1959, and the question and answer transcript of Feb. 19, 1960, are admissible as statements against interest made by White while acting as an agent for Thomas Wheeler and Lynn within the scope of his authority. Cf. *United States* v. *O'Connor*, 433 F. 2d 752, 755-756 (C.A. 1, 1970). We have relied upon them in making some of our findings of fact.

2(b). *Intentional overstatements of deductions for accrued officers' salaries.*—During each of its fiscal years ended July 31, 1957, July 31, 1958, and July 31, 1959, Raymond L. White, assistant treasurer of Lynn, at the direction of Thomas Wheeler, president, treasurer and sole shareholder, accrued $10,000 of officers' salaries on the books of Lynn. The $10,000 accruals, although remaining unpaid, were reflected on Schedule E of Lynn's income tax returns for the taxable years ended July 31, 1957, and July 31, 1958, as compensation to Thomas Wheeler. Correspondingly, the same $10,000 amounts were utilized as deductions from gross income on page 2 of Lynn's returns for the taxable years ended July 31, 1957, and July 31, 1958. Ominously, the $10,000 accrued salary deduction does not appear on Lynn's return for its taxable year ended July 31, 1959. Lynn's return for its taxable year ended July 31, 1959, was not filed until November 24, 1959, at least 2 months after Special Agent Ansbigian began his income tax investigation of these petitioners.

The fact that the deduction for unpaid salary does not appear on Lynn's return for its taxable year ended July 31, 1959, standing alone, might cause one to surmise that the chronological sequence of events was coincidental. However this fact, coupled with a record replete with fraudulent overstatements of deductions, further reflects petitioners' consistent and flagrant pattern of willfully evading their taxes. There can be no mistake about the fact that the salaries accrued during Lynn's fiscal years ended July 31, 1957, and July 31, 1958, remained intentionally unpaid, at least through May 1961, when Special Agent Ansbigian completed his investigation. We also note that Lynn's fiscal year ended July 31, 1959, return was due on October 15, 1959 (sec. 6072(b)), but an extension was requested via Form 7004 and a telegram during October 1959. The fact that these accrued salaries remained unpaid would rule out any intent to take advantage of section 267(a), permitting the deduction of accrued expense where actually paid within 2½ months after the close of the taxable year.

Several civil tax cases have resulted in a finding of corporate "fraud" where unpaid or accrued salaries which were deducted from gross income were either the only indicia or one of the major indicia of fraudulent intent imputed to the corporation. See, e.g., *The Globe, Inc.*, 28 B.T.A. 119 (1933).

The Lynn Corporation had few employees during the years in question, and its returns and books attest to the fact that its transactions were limited and uncomplicated. Accordingly, it cannot be inferred that the complexity of the situation generated an oversight in failing to reverse the accrual entries in all years except one during which the Internal Revenue Service commenced its investigation.

The record presents clear and convincing evidence that the salary accruals for Lynn's taxable years ended July 31, 1957, and July 31, 1958, were designed by Thomas Wheeler or other officers of Lynn to wrongfully reduce Lynn's tax liability. Even if Thomas Wheeler did not "engineer" these deductions, it would not alleviate the imputed corporate responsibility from Raymond L. White, an officer and director. *Irving S. Federbush, supra; Auerbach Shoe Co., supra.* The key factor involved in these claimed deductions is that no money was actually paid, and the net effect was to reduce the tax liability of Lynn, which Thomas Wheeler owned and controlled.

This particular transaction lends weight and credibility to Raymond L. White's testimony and erases any connotative inference of his benefit from the whole of the wrongful course of conduct reflected in this record.

2(c). *Salary or bonus "kickback."*—For the taxable year ended July 31, 1957, a $3,500 salary deduction was reflected on Lynn's return as part of a total deduction of $13,500, which also included the wrongful $10,000 accrual. Without repeating the detailed facts set forth in our findings the following should suffice to summarize this claimed deduction: Thomas Wheeler directed Raymond L. White to obtain an amount of cash from Lynn after the close of the July 31, 1957, fiscal year. Wheeler told White to draft a "salary" or "bonus" check and "make up" a travel voucher within certain general prescribed limits; draft a second check and then to cash it and remit the proceeds to Wheeler. As part of the scheme, White was to report the salary portion on his own tax return, even though he did not receive any part of it. After White told Wheeler that he would incur additional tax liability because of the $3,500, Wheeler gave $1,000 back to White. Shortly thereafter, White deposited the $1,000, along with $100 of his own money in his personal savings account.

The composition of the evidence in this record supports White's testimony. The $2,217.88 travel expense check and the $3,500 salary check were drafted and cashed at the same time. Both were dated after the close of the corporation's fiscal 1957 year and recorded as of the last day of that fiscal year. The deposit of the $1,100 into White's savings account in close proximity to the cashing of the checks and the reporting of the $3,500 on Raymond L. White's personal income tax return also corroborate his testimony. Of the three Lynn returns in evidence, only the one with the $3,500 (fiscal year 1957) shows a salary for White, but all three show alleged salaries of Wheeler. White could not have been attempting to secrete the $3,500 from Wheeler because it

was prominently reflected in Lynn's books and on its return for the fiscal year ended July 31, 1957.

Schemes to withdraw corporate earnings by shareholders under the guise of salaries or bonuses to others, who are advanced amounts to cover their extra tax liabilities, are not unique to this case and have resulted in findings of corporate fraud by this Court. See *Bennett E. Meyers*, 21 T.C. 331 (1953); *Auerbach Shoe Co., supra.*

2(d). *Legal fees in divorce proceedings.*—During Lynn's taxable years ended July 31, 1957, and July 31, 1958, Raymond L. White, at the direction of Thomas Wheeler, paid the following legal fees connected with Wheeler's personal divorce action as follows:

| Date | Ultimate payee | Amount |
| --- | --- | --- |
| May 10, 1957 | J. Dupont | $3, 000 |
| June 26, 1957 | Sam Cohen | 2, 000 |
| Sept. 27, 1957 | Talcott Banks | 2, 500 |

The record reveals that White's first impression when he made and recorded these disbursements was that the expenditures were personal in nature and that they were to be charged to Wheeler's account with the corporation. White subsequently posted these disbursements to Lynn's professional expense account, at Wheeler's direction, and they were deducted from Lynn's gross income for the periods involved.

The various documents and testimony in evidence herein show that Lynn and its officers were only involved in the divorce proceeding to the extent that they were temporarily restrained from wasting the assets of the corporation, which were a subject of the divorce because of Wheeler's ownership of all the shares of Lynn, which in turn held all the shares of Hicks. Talcott Banks sought the restraining orders on behalf of Ruby Wheeler, Thomas Wheeler's estranged wife, who was prosecuting the divorce action.

On May 3, 1957, the injunction issued under prayer 1 of the petition. On May 17, 1957, a decree nisi was issued and the parties' trust agreement was filed. The trust agreement resolved the question of any corporate involvement in the divorce, since 25 percent of Thomas Wheeler's stock in Lynn was pledged to secure payment of the $20,000 annual support to Ruby Wheeler by Thomas Wheeler. Thereafter, on May 20, 1957, Joseph L. Dupont filed his appearance and answers for Thomas Wheeler, Lynn, Hicks, and sundry officers. Dupont withdrew his appearance on September 4, 1957. Dupont was paid $3,000 by means of one check from Lynn, which constituted his entire fee with regard to the divorce. On August 21, 1957, Samuel H. Cohen entered his appearance for Wheeler and his related corporate entities. Cohen filed a motion to dissolve the temporary re-

straining order on September 4, 1957, and a decree absolute issued on November 18, 1957. Cohen was paid $2,000 by means of one check from Lynn, which constituted his entire fee. Except for an appearance on September 4, 1957, by attorneys Foley and Carey, who were paid out of the $3,000 paid to Dupont, Thomas Wheeler had no other representation in the divorce action.

While the facts might tend to indicate that some small portion of the $5,000 in fees paid to attorneys Dupont and Cohen may have been attributable to the corporate petitioner, we think Thomas Wheeler was the protagonist and object of Ruby Wheeler's suit for divorce and that most, if not all, of the legal representation was for his personal benefit.

What little credence one might have attributed to the Cohen and Dupont payments by Lynn is lost when the payment to Talcott Banks is considered. Banks, who represented Ruby Wheeler throughout the entire divorce action, was paid $2,500 by means of a Lynn check. By no stretch of the imagination can petitioners rationalize, justify, or explain away the payment and deduction against income by Lynn of legal fees to an adversary's attorney. The flagrancy and wrongfulness of this claimed deduction is further shown by the manner in which the check was drafted and the entries concerning it were carried on Lynn's books. The check was drafted to Cohen, who had filed an appearance for Thomas Wheeler, Lynn, et al. The entry in the cash disbursement journal showed Cohen as the payee, and the deduction was posted to Lynn's "Professional Services" account, thereby finding its way to the corporate return. Cohen endorsed the check over to Banks' law firm. Petitioners have provided no explanation as to the deceptive means of payment to Banks. Upon receipt of the $2,500 Lynn check, Banks recognized the irregularity of the means of payment and notified petitioners that he would assume the funds used for payment were Thomas Wheeler's unless he heard otherwise. Banks was not advised to the contrary.

The law is clear on the point that legal fees incident to a divorce of husband and wife are not deductible but are personal in nature. *United States* v. *Gilmore*, 372 U.S. 39 (1963); *United States* v. *Patrick*, 372 U.S. 53 (1963). The nondeductibility of these legal fees is not cured, even if, as here, the wife enjoins the husband from wasting or disposing of his property. Ruby Wheeler sought and received monetary payments ($1,666.67 per month), and 25 percent of Thomas Wheeler's stock was pledged to secure payment of his obligation. There was no attack by Ruby Wheeler on the assets of the corporation; she merely restrained the wasting of the assets.

Additionally, there is some mention in the record that Thomas Wheeler was ordered to pay his wife's legal fees for the divorce.

Wheeler, except for the $2,500 paid by Lynn, paid the balance of Banks' legal fee by personal checks.

2(e). *Wrongfully deducted travel expenses.*—Except for the Celanese transaction, Lynn's balance sheets, ledger accounts, and income statements show that substantially all of its activity and income was attributable to its ownership of Hicks and the receipt of rental income from Hicks. Raymond L. White, who was assistant treasurer of Lynn during the period involved, states that little or no travel was required for Lynn. It did not employ many people, as indicated by the following salaries for employees on its returns:

| Fiscal year ended July 31— | Total employee salaries |
|---|---|
| 1957 | $2, 687. 74 |
| 1958 | 320. 00 |
| 1959 | 7, 760. 28 |
| Total | 10, 768. 02 |

Thomas Wheeler did not receive a salary from Lynn during the fiscal years ended July 31, 1957, and July 31, 1958. As previously stated, the amounts accrued during these periods were not paid. During the taxable year ended July 31, 1959, Thomas Wheeler received a salary of $5,375.

Notwithstanding the salary pattern and apparent lack of business activity, Lynn claimed travel expenses for the 3-year period in question, as follows:

| Fiscal year ended July 31— | Travel expense claimed |
|---|---|
| 1957 | $8, 047. 59 |
| 1958 | 4, 087. 58 |
| 1959 | 20, 852. 29 |
| Total | 32, 987. 46 |

A part of the $8,047.59 claimed as travel expense on Lynn's taxable year ended July 31, 1957, return is the $2,217.88 fictitious travel claimed by Raymond L. White at Thomas Wheeler's direction. White testified that he did not perform the travel shown in the false voucher prepared. The voucher was "made up" to approximate $2,200 at Wheeler's request. The $2,217.88 was associated with the $3,500 salary kickback. Both checks were drawn on the same day, cashed on the same day and recorded in Lynn's books as of the same date, backdated to July 31, 1957, and the proceeds of both were given to Wheeler.

In other instances, like the alleged salary of Thomas Wheeler, travel expenses were accrued but unpaid, thereby reducing Lynn's tax liability without making payment. To further compound the fiction of the travel expenses claimed on Lynn's returns, the travel vouchers of Thomas Wheeler that were submitted to Hicks for the same periods

account, in most instances, for every weekday, and place Thomas Wheeler in locations other than the ones cited in Lynn's travel vouchers for the same periods. No substantiating documentation was submitted for any of the Lynn travel allegedly performed by Wheeler. The following schedule reflects the Lynn travel claimed, allowed, and disallowed:

| TYE July 31— | Claimed | Disallowed | Allowed |
|---|---|---|---|
| 1957 | $8,047.59 | $7,317.88 | $729.71 |
| 1958 | 4,087.58 | 3,619.00 | 468.58 |
| 1959 | 20,852.29 | [1] 20,299.50 | 552.79 |
| Total | 32,987.46 | 31,236.38 | 1,751.08 |

[1] This amount includes the $9,300 deducted by both Thomas Wheeler and Lynn concerning the "Celanese transaction."

We think the facts and figures presented in this record support respondent's determination that the claimed travel was fictitious, and the amounts received by Thomas Wheeler were not to reimburse him for travel. Wheeler included $8,000 of so-called travel advance from Lynn in his original return for 1959, which was filed June 15, 1960, about 9 months after the investigation commenced. Wheeler's earlier returns do not contain any similar entries. Respondent contends that the inclusion of the $8,000 is an admission of the fact that no travel was performed with respect to it and a clear indication of the fallibility or fallacious character of the other travel expenses claimed on Lynn's returns. He argues that Thomas Wheeler used the funds removed from Lynn under the guise of being travel expense for personal expenditures. We agree.

This Court has imposed the fraud penalty against a corporate entity and its shareholders where fictitious travel expenses were deducted by the corporation and paid to the shareholders for their personal expenses. *Edward S.* and *Dorothy T. Maloney*, T.C. Memo. 1958–39; *Esquire Motors, Inc.*, T.C. Memo. 1969–40.

$9,300 was also deducted as a part of Lynn's $20,852.29 travel expense deduction on its return for its taxable year ended July 31, 1959. In addition to Lynn receiving $42,100, Hicks receiving $15,000, Thomas Wheeler receiving $24,500, and various other Hicks employees receiving $8,400 as reimbursement in full for expenses connected with the "Celanese transaction," both Lynn and Thomas Wheeler deducted the same $9,300 on their respective original returns for that period. The record is clear that Hicks paid for Thomas Wheeler's air travel, accommodations, and other travel expenses during the period of the "Celanese transaction." Here again, Thomas Wheeler, by filing an amended 1959 return, admitted that he did not incur travel expenses for the $9,300; and since Lynn did not pay or reimburse Wheeler in

the amount of $9,300, it clearly would not be entitled to said sum, especially in light of the $42,100 it received from Wheeler Rocket. The fact that Wheeler filed an amended return to correct the fraud that permeated the original return does not bar the imposition of the addition to tax for fraud. See *Elmer J. Benes*, 42 T.C. 358 (1964), affirmed per curiam 355 F. 2d 929 (C.A. 6, 1966); *Henry Naples*, 32 T.C. 1090 (1959).

2(f). *Wrongful deduction of a bad debt.*—Raymond L. White, at the direction of Thomas Wheeler, deducted an alleged bad debt in the amount of $6,918.62 from Lynn's gross income for its taxable year ended July 31, 1959. The $6,918.62 was the balance of an account on Lynn's books which reflected its investment in three parcels of realty located at 2, 4, and 6 New Street, East Boston, Mass. Thomas Wheeler, through Lynn, supplied to Norfolk Supply Co., a shell corporation of Lynn and Thomas Wheeler, the money necessary to purchase the property. Thereafter, Norfolk purchased the three parcels and deeded two of them, one parcel each, to Border and Middle Corporations, also shells of Lynn. None of these shell corporations had employees, books, or filed returns, and all of the transactions concerning New Street were recorded on Lynn's books. The account on Lynn's books was entitled "Norfolk Supply." Then 2 and 4 New Street were sold to Messrs. Bimbo and Hughes and the title to number 6 New Street remained in Border, which was a shell for Lynn. The essence of respondent's position that this was a wrongful deduction rests on the fact that Lynn was "writing off" its investment account at a time when it still owned 6 New Street. Six New Street had, at that time, an assessed valuation of at least $25,000 on the City of Boston's assessment list, which may have represented less than 100 percent of actual value. Additionally, 2 and 4 New Street had just been sold for $77,500 to Bimbo and Hughes, which transaction would be some indication of the value of immediately adjoining property.

To write off an asset account, or any account which represents the ownership of valuable property, cannot be classified as mere bookkeeping error. But where Thomas Wheeler and Lynn utilized the three shell corporations to facilitate the purchase and sale of 2 and 4 New Street, they cannot merely treat one of them as a separate corporate entity. The intent not to do so is evidenced by the fact that no returns were filed by Border and it has no books or employees. Petitioners have submitted no evidence that would give credence to their deducting the balance of the Norfolk Supply account.

3(a). *Fraud—Thomas Wheeler.*—Where, as here, a corporation's income is reduced by fictitious and false deductions and the individual shareholders receive the amounts so deducted, it is clear that the addition to tax for fraud may be assessed against both the corporation

and the shareholders. See *Irving S. Federbush, supra; Stephen L. Morrow*, T.C. Memo. 1967–242. Thomas Wheeler has attempted to infer that Raymond L. White was withdrawing funds from Lynn and trying to conceal this by false deductions. This attempted inference fails in light of the fact that several of the fictitious and false deductions were in the form of intentionally unpaid accruals. In these instances the deduction is taken and the money is not paid. There is no way that petitioners could convince this Court that Raymond L. White was "fixing" Lynn's books for Thomas Wheeler's benefit and without Wheeler's knowledge, where White himself received no benefit whatsoever. The situation here is similar to *Rau's Estate* v. *Commissioner*. 301 F. 2d 51 (C.A. 9, 1962), affirming a Memorandum Opinion of this Court; and *Doggett* v. *Commissioner*, 275 F. 2d 823 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court.

Thomas Wheeler was convicted of his personal and Lynn's income tax evasion based on his plea of nolo contendere. The crime to which Wheeler pleaded and was convicted was a felony. Raymond L. White's testimony is supported by other testimony and extensive documentary evidence, whereas Thomas Wheeler's testimony consists of general and categorical denials not supported by the record as a whole. We regard some of Wheeler's testimony as inconsistent and unreliable. Wheeler did not satisfactorily explain his plea of nolo contendere. Although collateral estoppel is not applicable with respect to Wheeler's plea of nolo contendere, the Court of Appeals in *Masters* v. *Commissioner*, 243 F. 2d 335 (C.A. 3, 1957), affirming 25 T.C. 1093 (1956), artfully expressed the significance of a plea of nolo contendere as follows (p. 338) :

> What we are dealing with is not a mere plea but a judgment of conviction and sentence thereon. Appellants urge that under those circumstances their convictions may not be put into evidence as affecting their credibility. The argument is without merit. There is no valid distinction between a judgment of conviction based on a plea of "nolo contendere" and such judgment entered after a plea of "guilty". The former is an attempted face saving process. A trial judge may at times consent to that procedure but when it is followed by judgment of conviction and sentence it merely provides a surface language cloak which is completely removed by the judgment and sentence. That type of conviction is admissible evidence for impeachment purposes. Kilpatrick v. Commissioner of Internal Revenue, 5 Cir., 1955, 227 F. 2d 240, 243 ; Pfotzer v. Aqua Systems, 2 Cir., 1947, 162 F. 2d 779, 785 ; Fisher v. United States, 1 Cir. 1925, 8 F. 2d 978, 981 ; United States v. Dasher, D.C.E.D. Pa. 1943, 51 F. Supp. 805, 806.

We find the evidence of fraud by Wheeler to be clear and convincing for each of the years 1956 through 1959. Some of the indicia of fraud are set forth below.

3(b). *Wrongful deduction of legal fees.*—As previously discussed, Lynn, during 1957, by means of a $2,500 check to attorney Samuel

Cohen, endorsed to the firm of attorney Talcott Banks, paid part of Thomas Wheeler's estranged wife's legal fees. Thomas Wheeler, by means of a personal check, also paid attorney Banks $2,000 during 1957. In the same deceptive manner as was used in the corporate payment, Thomas Wheeler's personal check was drawn to attorney Samuel Cohen, who endorsed it over to attorney Talcott Banks.

Both attorneys Cohen and Dupont were paid their entire fees by Lynn, and the record does not reveal any payments during 1957 by Thomas Wheeler to attorney Banks, except for the $2,000.

In addition to Thomas Wheeler wrongfully deducting and attempting to conceal the $2,000 paid by personal check to attorney Banks, he also apparently deducted the $2,500 paid and wrongfully deducted by Lynn, thereby creating a double deduction. We note that Thomas Wheeler, by various personal checks naming attorney Banks as payee, paid $4,500 during 1958 and claimed no attorney's fee as a deduction on his 1958 return.

3(c). *Understatements of taxable income by Wheeler failing to include amounts received or paid on his behalf by Lynn, which were designated as corporate business expenses.*—During the taxable years 1957 and 1958 Thomas Wheeler received or was paid, on his personal behalf, the following amounts:

| Item | 1957 | 1958 |
|------|------|------|
| 1. Fictitious travel reimbursement to Thomas Wheeler | $1,300.00 | $1,270 |
|  | 3,800.00 | 410 |
|  | 730.00 | 250 |
| 2. Fictitious travel reimbursement in name of Raymond L. White and paid to Thomas Wheeler | 2,217.88 | |
| 3. Raymond L. White salary or bonus kickback to Thomas Wheeler | 3,500.00 | |
| 4. Payment of Thomas Wheeler's divorce attorneys | 5,000.00 | |
| 5. Payment of Ruby Wheeler's divorce attorney | 2,500.00 | |
| 6. Payment for Thomas Wheeler's personal recreation | | 49.50 |
| Totals | 19,047.88 | 1,979.50 |

3(d). *Failure of Wheeler to report excess travel reimbursements.*— This record reveals that Thomas Wheeler knowingly falsified and overstated his travel expenses without reporting the excess on his tax returns for the years involved. Thomas Wheeler's total claimed travel for the 3-year fiscal period of Hicks was $50,746. On the average, this represents $16,915.33 per year, $1,409.61 per month, $46.99 per day, and $67.66 per working day, based upon a 250-day working year. The exaggerated proportions of these figures are further expanded by reference to the fact that they are to be judged by 1956 through 1959 living standards.

Examination of the "Expense Accounts" submitted by Thomas Wheeler to Hicks reveals that each one of them follows a familiar pattern. They are all in round amounts. Each travel entry is followed

by an all-inclusive category entitled "Conferences." No matter where Thomas Wheeler allegedly was, he claimed an amount averaging $50 or more per day for "Conferences." These "Conference" amounts even appear when Wheeler has placed the situs of the conference at the main office of the corporation. In addition to the "Conference" amounts, meals, hotels, and tips are also consistently shown in recurring amounts which are identical in amount for each city shown. More specifically, there is a distinct pattern to the entries in the "Expense Accounts." The amount listed as "tips" is unerringly 10 percent of the adjacent conference amount. Thomas Wheeler's Hicks "Expense Accounts" also show that almost every weekday is accounted for. In each month there is a lump-sum automobile charge ranging from $20 to $75, but usually shown at $50. It is difficult for us to believe that an individual's expenses could so perfectly remain consistent in amount, or that his meals would cost the same at each sitting or that he would attend "such expensive conferences" no matter where he was or with whom he attended.

The lack of substantiation at the trial regarding the Hicks travel expenses shows the situation encountered by Special Agent Ansbigian when he requested documentation and substantiation of the items shown on Thomas Wheeler's "Expense Accounts." Since the data supplied to Special Agent Ansbigian was inadequate, he had to reconstruct the travel performed by Thomas Wheeler for Hicks. Respondent's reconstruction was developed by means of placing Thomas Wheeler in a travel status any time he could definitely be placed away from the corporation. Special Agent Ansbigian's reconstruction of travel allowances for the 36-month period of Hicks totaled $23,900.59, which represents 47 percent of the $50,746 travel claimed by Thomas Wheeler for the same 36-month period. It is difficult to believe Wheeler's testimony that he had no personal expense and that he traveled 7 days a week. In fact, it is hard to imagine that the sole owner of Hicks, with over 400 employees, would be able to be away from his base of operation almost all the time. In our opinion respondent's reconstruction of travel expenses is reasonable. He has allowed extensive amounts of unsubstantiated expenses incident to and possibly unrelated to travel (conference expense) to arrive at a fair reconstruction of Thomas Wheeler's travel. His reconstruction of Wheeler's travel for Hicks goes far beyond that which would be allowable under the *Cohan* rule, in view of the lack of substantiation on the part of petitioners. The total daily amounts of allowance in respondent's reconstruction ranges from $45 to about $90 and averages over $70 per day without the transportation expense that was paid by the Hicks Corp.

3(e). *Other personal expenses of Wheeler paid by Hicks.*—In addition to utilizing travel reimbursements from Hicks for his personal

expenses, the record contains evidence of personal expenses of Thomas Wheeler being paid by Hicks and charged as costs on various jobs being performed by Hicks. During Wheeler's taxable year 1957, Hicks paid his florist bill and a motel bill for his family. During Wheeler's taxable year 1958, Hicks paid numerous florist's charges for flowers to Thomas Wheeler's wife and mother, and an electrician was paid for electrical work performed at Thomas Wheeler's mother's residence. These payments were charged against Hicks' cost of sales, and Wheeler did not include these amounts on his income tax returns for 1957 and 1958. Although the personal expenses of Wheeler, paid directly by Hicks, are relatively small in relation to the excess travel reimbursement, they are specific items showing his knowledge and intent concerning the fraudulent omissions of income.

4. *Fraud—Shirley Wheeler.*—Public Law 91–679 (84 Stat. 2063, 1971–1 C.B. 547), enacted January 12, 1971, amended section 6653(b), I.R.C. 1954, to relieve a spouse filing a joint income tax return under section 6013 from liability under section 6653(b) for fraud except where some part of the underpayment is due to the fraud of such spouse. The amendment is applicable to all taxable years to which the Internal Revenue Code of 1954 applies. Since these cases were tried before the enactment of Public Law 91–679, respondent has conceded on brief that Shirley C. Wheeler is not liable for any addition to tax under section 6653(b) for the taxable years 1957, 1958, and 1959. This concession does not affect the deficiencies determined against Shirley Wheeler for such years because there is no evidence in this record to show that Shirley Wheeler is entitled to be relieved of liability for the deficiencies under section 6013(e), and petitioners have made no attempt to assert the applicability of section 6013(e). The new provision in section 6653(b) merely relieves her of the liability for the fraud penalty, and respondent's proof of fraud by Thomas Wheeler prevents the running of the statute of limitations so that Shirley Wheeler remains liable for the deficiencies for the years in issue. See *Nathaniel M. Stone*, 56 T.C. 213 (1971).

5. *Statute of limitations.*—Having determined that a part of the underpayment by the Lynn Corp. for each of the fiscal years ended July 31, 1957, July 31, 1958, and July 31, 1959, and by Thomas Wheeler for the taxable years 1956 through 1959 was due to fraud, it follows that the assessment of deficiencies for such years is not barred by the statute of limitations. See sec. 6501(c)(1) of the Code.

6. *Gain on sale of 2 and 4 New Street property.*—Lynn's Federal income tax return for the taxable year ended July 31, 1959, does not reflect any income from the sale of realty. In addition, there is no mention or use of the term "installment" sale. Section 453 of the Code

permits the use of installment sale reporting pursuant to regulations prescribed by the Secretary or his delegate. Section 1.453-8(b)(1), Income Tax Regs., requires the taxpayer to set forth his election in the return or in an attached statement. An election, as required by section 1.453-8(b)(1), does not appear within the "four corners" of Lynn's tax return for its taxable year ended July 31, 1959, or in a statement attached thereto. Lynn received, through its straws, $2,500 cash and a note in the face amount of $75,000, in exchange for 2 and 4 New Street during its fiscal year ended July 31, 1959. Petitioners, who have the burden of proof with respect to this item, have failed to show that the note involved had a fair market value that was less than the face amount of the note or that the installment sales method of accounting had been elected. Consequently, it follows that Lynn failed to include $61,719.17 of income from the sale of realty during its taxable year ended July 31, 1959, as determined by respondent in his notice of deficiency concerning Lynn.

Even petitioners' witness, Harry Eigner, admitted, as he had to, that he could not have discerned an installment sale without referring to the books and records of Lynn. Clearly, the intent to utilize the installment sales provisions of section 453 and the regulations thereunder was an afterthought to justifiy Lynn's failure to report the sale. We think respondent's inclusion of the gain in income was proper. *W. T. Thrift, Sr.*, 15 T.C. 366 (1950); and *John Harper*, 54 T.C. 1121, 1142-1147 (1970). The same result has been reached even where no payments were received in the year of sale. *Ackerman v. United States*, 318 F. 2d 402 (C.A. 10, 1963), affirming 205 F. Supp. 365 (D. Wyo. 1962).

7. *Miscellaneous adjustments—failure of proof.*—Although respondent has the burden of proving fraud by clear and convincing evidence, petitioners have the burden of proving they are entitled to deductions or the reasons for failing to include income as determined by respondent. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 32, Tax Court Rules of Practice. On this record the petitioners have not carried their burden of proof on the following adjustments determined by respondent:

LYNN CORPORATION

| Adjustments | Taxable year ended July 31— | |
| --- | --- | --- |
| | 1957 | 1958 |
| Massachusetts excise tax | $2,894.67 | $749.98 |
| Asheville excise tax | 779.94 | 1,595.88 |
| Depreciation | | 70.92 |
| Insurance reimbursement | | 33,143.87 |
| Real estate taxes, Boston | | 1,906.06 |
| Massachusetts excise tax refund | | 2,490.87 |

THOMAS WHEELER AND THOMAS WHEELER AND SHIRLEY WHEELER

| Adjustments | Taxable year | | | |
|---|---|---|---|---|
| | 1956 | 1957 | 1958 | 1959 |
| Distribution from Border | $494.84 | | | |
| Shirley Wheeler travel | | $317.05 | $797.24 | $499.97 |
| Medical expense | | | 381.91 | |

To reflect the concessions of respondent and the conclusions reached herein,

*Decisions will be entered under Rule 50.*